SOCIALIST WORKERS PARTY, Clifton DeBerry, Kipp Dawson, Jon Rothschild, Miguel Padilla, Ruthann Miller, Hedda Garza, Michael Arnall and Jack Wood, Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York, John P. Lomenzo, Secretary of State of the State of New York, Louis J. Lefkowitz, Attorney General of the State of New York, Defendants.

SOCIALIST LABOR PARTY OF AMERICA, an independent political association, John Emanuel, Walter Steinhilber, Stephen Emery, Bernard Reitzes, Israel Feinberg, Doris Ballantyne, Freedom & Peace Party of New York State, an independent political association, Karl Bernard, Nathan Solomon, Andrew Talbutt, David Dubnau, Jeanne Dubnau, Marjorie Thalheimer, on behalf of each and on behalf of all other independent political associations in the State of New York wishing to submit candidates for election to public office, and their respective supporters, including, without being limited to, Communist Party (U.S.A.), Peace & Freedom Party, National Renaissance Party, and Socialist Worker's Party, Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York; John P. Lomenzo, Secretary of State of the State of New York; Louis J. Lefkowitz, Attorney General of the State of New York; the Board of Elections of the City of New York, Defendants.

Nos. 70 Civ. 1374, 1642.

United States District Court,
S. D. New York.

June 18, 1970.

Judgment Affirmed Oct. 12, 1970.
See 91 S.Ct. 65.

Leonard B. Boudin, Rabinowitz, Boudin & Standard, New York City, for Socialist Workers Party, and others, plaintiffs; David M. Rosenberg, Dorian Bowman, New York Civil Liberties Union, Burt Neuborne, David Dretzin, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Charles A. LaTorella, Robert S. Hammer, Asst. Attys. Gen., of counsel.

Before FEINBERG, Circuit Judge, and PALMIERI and TENNEY, District Judges.

## OPINION

TENNEY, District Judge.

The above two captioned suits, consolidated without opposition by order of the district court dated May 11, 1970, and submitted to a statutory three-judge court by orders of Chief Judge J. Edward Lumbard of the Court of Appeals dated May 4, and 14, 1970, place in issue the constitutionality of various sections of the New York State Election Law (McKinney's 1964) (hereinafter referred to as the "Election Law") which govern and affect the process to be followed by independent political parties in nominating candidates for election to state-wide and local public offices in the next-scheduled general election to be held in November 1970.

Basing jurisdiction of the court upon 28 U.S.C. §§ 1331, 1343(3) and 42 U.S.C. § 1983, plaintiffs seek to redress the alleged deprivation, under color of State law or statute, of rights, privileges and immunities secured to them by Article IV, Section 2 of the Constitution of the United States and by the First, Ninth, Fourteenth and Fifteenth Amendments thereto. A declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 and permanent injunctive relief are sought to invalidate and restrain defendants from enforcing and implementing the following sections of the Election Law.[1]

(a) Section 138(5) (a) of the Election Law, McKinney's Consol.Laws, c. 17, which provides:

"An independent nominating petition for candidates to be voted for by all the voters of the state must be signed by at least twelve thousand voters, of whom at least fifty shall reside in each county of the state, and counties of Fulton and Hamilton to be considered as one county";

1. Plaintiffs in the first of the above two captioned suits challenge the constitutionality of Section 138(1), (3), (5) (a) and (6), and Section 168 of the New York State Election Law. Plaintiffs in the second of the above two captioned suits challenge the constitutionality of Section 138(5) (a) and (6), Section 376 and Section 31 of the Election Law.

(b) Sections 138(1) and (6) of the Election Law, which provide, respectively:

"Independent nominations for public office may be made by a petition * * * containing the signatures of qualified voters of the political unit for which a nomination is made who were registered to vote therein at the last preceding general election"; and

"The name of a person signing * * * [an independent party nominating] petition for an election for which voters are required to be registered shall not be counted if such person was not registered at the time of the last preceding general election as a qualified voter; or, if such person voted at a primary election where a candidate was nominated for an office for which such petition purports to nominate a candidate; or, if the name of a person who has signed such a petition appears upon another petition designating or nominating the same or a different person for the same office";

(c) Section 138(3) of the Election Law, which provides that petitions for independent nominations for public office be "authenticated by witnesses" who must aver on a separate form that the witness "know each of the voters whose names are subscribed to this petition";

(d) Section 168 of the Election Law, which provides that "The board of regents of the state of New York shall make provisions for the giving of literacy tests" which shall ascertain whether the voter "is able to read and write English, or is able to read and write English save for physical disability only." A new voter may be registered without having taken such literacy test by presenting evidence of the fact or completing an affidavit to the effect that the voter has completed the work up to and including the sixth grade of an approved elementary school in which English is the language of instruction or of a public or private school accredited by the Commonwealth of Puerto Rico in which school instruction is carried on predominantly in the English language;

(e) Section 376 of the Election Law, which provides that the compilation of current names, residence addresses and registration serial numbers of the registered voters in each election district be sent free of charge to those parties which polled more than 50,000 votes in the last gubernatorial election, that at least twelve copies be kept for public inspection at each main office of the board of elections and that surplus copies at not exceeding the cost of reproduction be sold to anyone who may apply therefor; and

(f) Section 31 of the Election Law, which provides that the respective chairmen of the New York and Kings County Republican and Democratic Parties shall recommend or nominate qualified persons for appointment as commissioners of elections.

In the first of the above two captioned suits, plaintiff Socialist Workers Party of New York (hereinafter referred to as the "S.W.P."), an independent political party as defined by Section 2 of the Election Law (having polled less than 50,000 votes for governor at the last preceding election), has selected a slate of candidates for election to state-wide and local public offices and seeks to obtain the required number of signatures on nominating petitions to qualify these candidates for a position on the ballot in the November 1970 general election. Charging that the established political parties in New York support a capitalist system in which all real power is invested in a tiny minority, the very rich, the S.W.P. seeks to present an alternate program to the electorate of "working people, Afro-Americans, Puerto Ricans, women, and students winning control over their own lives."[2] Joined with S.W.P. as parties plaintiff in this suit are its candidates for state-wide and local offices in the upcoming election, and

---

2. Complaint ¶ 5 at 5, 70 Civ. 1374 (dated April 3, 1970).

three New York State citizens who have become registered voters since the last general election held in November 1969 and who intend to sign nominating petitions for S.W.P. candidates. Only one of these three plaintiffs had satisfied New York State's residency requirements at the time of the last general election.[3]

Plaintiff Socialist Labor Party of America (hereinafter referred to as the "S.L.P."), named in the second of the above two captioned suits, seeks to achieve a "classless society based upon collective ownership of all industry, to be administered by a government composed of democratically elected representatives of each industry."[4] Joined with S.L.P. as parties plaintiff are its 1969 candidates for New York City office, its 1970 candidates for state-wide office, its chief executive officer, campaign manager and Kings County organizer.

■ Plaintiff Freedom and Peace Party of New York (hereinafter referred to as the "F.P.P."), joined with S.L.P.

in the second of the above two captioned suits, describes itself as an affiliate of a national organization "dedicated to the elimination of racism and militarism from American life."[5] This independent party has not yet officially designated its candidates for the 1970 general election. However, joined with F.P.P. as parties plaintiff are named individuals who "are prepared to run for public office as candidates of [F.P.P.] and wish to appear officially upon the ballot in such capacity",[6] its officers and a qualified voter who had not yet attained the age of 21 years at the time of the last preceding general election and wishes to sign a nominating petition on behalf of a minority candidate in connection with the 1970 elections.[7]

In substance, plaintiffs charge that the threatened enforcement of the provisions of the Election Law set forth above discriminates against and imposes unreasonably burdensome procedures upon independent or minority parties which impede their full and equal participation in the electoral process. They argue that

3. By order of the district court dated May 18, 1970, plaintiff S.W.P.'s unopposed motion to amend its complaint by adding Lee Smith as a named plaintiff was granted.

4. Complaint ¶ 2 at 2, 70 Civ. 1642 (dated April 22, 1970).

5. *Id.* at 7.

6. *Id.*

7. Defendant Governor Rockefeller moves to dismiss the within complaint as to him, alleging that he is not a proper party defendant to the action. We cannot agree.

Although there has been no showing that defendant Rockefeller has any "special relation" to the enforcement of the statutes under attack, a requirement first noted in Fitts v. McGhee, 172 U.S. 516, 530, 19 S.Ct. 269, 43 L.Ed. 535 (1899) and more recently in Oliver v. Board of Educ., 306 F.Supp. 1286, 1288 (S.D.N.Y. 1969) and Camacho v. Rogers, 199 F. Supp. 155 (S.D.N.Y.1961), it would appear that the effect of Ex parte Young, 209 U.S. 123, 156–158, 28 S.Ct. 441, 52 L.Ed. 714 (1908) is to permit a state officer to be named as a party defendant so long as such officer has "some connection" with the enforcement of the stat-

ute in question, which may be declared or specially created by such statute or which may arise out of the "general law". As noted in Ex parte Young, *supra* at 157, 28 S.Ct. 441, the important and material fact is simply the existence of some connection with the enforcement of the act by virtue of the office held by the party defendant.

By virtue of the office held by defendant Rockefeller he is specially authorized to "take care that the laws are faithfully executed." N.Y.Const. Art. IV, § 3 (1964). This would appear sufficient "connection with the enforcement of the act" under Ex parte Young. City of Altus, Okl., v. Carr, 255 F.Supp. 828, 834–835 (W.D.Tex.), aff'd per curiam, 385 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966). (It should be noted that Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969) and Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968) all named governor party defendants. Admittedly, the Court never addressed itself to this issue since motions by these defendants to dismiss the complaint as to them were not made below.)

independent candidates are unable to qualify for positions on the general election ballot without seriously draining their financial and manpower resources and debilitating the strength of the independent party to conduct a vigorous election campaign. Additionally, it is urged that enforcement of these statutory provisions will deprive plaintiffs of their right to freely associate for the advancement of their political beliefs, and debase and otherwise impair the right of all registered voters to the equal opportunity to effectively cast their votes for candidates of their choice.

## DISCUSSION

The right of individuals to organize and associate for the advancement of their political beliefs and the right of all qualified voters, regardless of political persuasion, to cast their votes effectively for candidates of their choice have been firmly established among our precious freedoms. Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). So long as these rights are held inviolate, minority and dissident political views can be aired in the public forum to serve as alternate solutions to contemporary problems and checks on the representation provided by the established or traditional political parties. It is this competition in ideas, approaches and governmental policies which is at the core of our electoral process, representative democracy and First Amendment freedoms. Sweezy v. New Hampshire, 354 U.S. 234, 250–251, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

■ Of course, the State is not powerless to fix *reasonable* standards or requirements for a position on the ballot so that multifarious political associations with little or no popular support do not bemuse the electoral process. The use of nominating petitions by independent political parties to obtain a place on the ballot has long been recognized as an example of such a reasonable requirement for obtaining a ballot position and as an integral part of the elective process. But, as such, when charges are made of

discrimination or of abridgement of the right to vote or associate, these procedures must be carefully scrutinized by the courts. Smith v. Allwright, 321 U.S. 649, 664, 64 S.Ct. 757, 88 L.Ed. 987 (1944); United States v. Classic, 313 U.S. 299, 314–318, 61 S.Ct. 1031, 85 L. Ed. 1368 (1941).

■ The power of the State to, in effect, limit the number of candidates placed on the ballot may not be exercised in a way that violates specific provisions of the Constitution. The right to vote freely for the candidate of one's choice, which manifestly encompasses the right of the candidate to a position on the ballot, lies at the essence of democratic society and "any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964).

■ If when the Election Laws are viewed in their totality it be found that independent parties have been denied an equal opportunity to win the vote of the electorate or that the right to vote has been diluted or debased, then only a showing of a compelling state interest therefor can justify such restraints on First Amendment freedoms. Kramer v. Union Free School District, 395 U.S. 621, 626–627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); William v. Rhodes, supra, 393 U.S. at 31, 89 S.Ct. 5; NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

■ Now, turning to the challenge raised in both suits with respect to Section 138(5) (a), it should first be noted that the requirement that an independent nominating petition be signed by at least twelve thousand voters is not contested; in issue is only the distributive requirement that at least 50 of these 12,000 voters reside in each county of the State, the counties of Fulton and Hamilton to be considered as one.

In opposition to this challenge, the State argues, *inter alia*, that "it is rea-

sonable and proper that a person who wishes to run for statewide office be required to show a minimal amount of statewide support for his candidacy" and that this requirement is *de minimus* differing significantly from the Illinois statute struck down in Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).[8]

Without passing upon the question of whether it is constitutionally permissible for the State to require an absolute showing of "statewide" support as opposed or in addition to a showing of "numerical" support, the Court's holding in *Moore, supra* at 818–819, 89 S.Ct. at 1496 is particularly applicable here:

"It is no answer to the argument under the Equal Protection Clause that this law was designed to require statewide support for launching a new political party rather than support from a few localities. This law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government."

The rigid distribution formula established by Section 138(5) (a) of the Election Law invests voters in *each* rural, less-populous county with an absolute *equal* veto power over the nomination of any candidate regardless of that candidate's possible overwhelming popularity with a majority of the voters of the State. While such unqualified power is undoubtedly particularly perilous to plaintiffs independent parties

which are principally oriented to the myriad problems faced by the urban population of the State,[9] it is the right of all qualified voters to equality in the exercise of their political rights which invalidates this statute.

Further, such a distributive requirement cannot be justified by arguing that the S.W.P. has attained a place on the general election ballot in the past. For as the Court noted in Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963):

"If a State in a state wide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote, none could successfully contend that that discrimination was allowable. How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment." (Citation omitted.)

The fact that this unconstitutional burden has been hurdled before, and not, it should be noted, without considerable drain on the limited resources available to new parties,[10] cannot negate the fact that by overweighting and overvaluing the votes of those living in less populated counties the votes of the majority of the electorate have been diluted and under-

---

8. Memorandum of law for Defendants Rockefeller, Lomenzo and Lefkowitz at 15–17 (dated May 11, 1970).

The State has challenged the standing of the S.L.P. and the F.P.P. on the grounds that neither party, with one exception, has designated candidates for a state-wide political office affected by Section 138(5) (a). The Court finds

it unnecessary to pass on this issue since this Section is similarly challenged by S.W.P. whose standing is uncontested by the State.

9. Affid. of Michael B. Arnall at 4 (dated April 10, 1970).

10. *Id.* at 5.

valued. Reynolds v. Sims, *supra*, 377 U.S. at 563, 84 S.Ct. 1362.

The Illinois statute in *Moore* required that the necessary 25,000 signatures include at least 200 from each of 50 of that State's 102 counties, while Section 158 of the Election Law requires 12,000 voters of whom 50 shall reside in each county of the State. Whatever differences may be discerned, the New York statute is as constitutionally indistinguishable from the Illinois statute as a Michigan statute was recently held to be in Socialist Workers Party v. Hare, 304 F.Supp. 534 (E.D.Mich.1969). Indeed, a comparison of the distributive requirements in the New York and Illinois statutes may well reveal the former to be even more objectionable.

New York has given the 7,161 registered voters in Schuyler County, who comprise approximately .09 of one per cent of the total State enrollment of 7,438,008 voters, the *same* absolute veto power as the 920,024 registered voters in Kings County, who comprise approximately 12.4 per cent of the total State electorate.[11] This is constitutionally impermissible.

We next turn to a discussion of the challenge levelled against Section 138(1) and (6) of the Election Law.[12]

The effect of these provisions on independent parties which seek a place on the ballot is threefold. Firstly, they are denied the support of an otherwise qualified voter if that voter was not registered at the time of the last preceding general election due either to his inaction or his ineligibility to qualify to register at that time.[13] Secondly, the independent party is denied the support of an otherwise qualified voter if that voter voted at a primary election where a candidate was nominated for an office for which the independent party petition purports to nominate another candidate. Thus, a voter who may have voted *only* for the gubernatorial candidate in the Democratic Primary, and not for that Party's candidate for the office of Attorney-General, is barred from signing a nominating petition for the S.W.P. candidate for Attorney-General. Thirdly, an otherwise qualified voter will not be counted on an independent party's nominating petition if such voter's name appears on another petition designating or nominating the same or a different person for the same office even though this other designating petition might have failed to secure the requisite number of signatures or have been ruled invalid by the Secretary of State for other reasons.

Of course, what must be considered in addition to any possible abridgement of associational freedoms protected by the First Amendment is the effect these regulations have on the right of otherwise qualified voters to effectively cast their votes for candidates of their choice.

The present procedure in New York, in a year in which there is a spring

---

11. The 1970 voter registration figures published by the Attorney General of the State of New York, annexed to plaintiff S.W.P.'s Exh. A, attached to Affid. of Victor Rabinowitz (dated April 10, 1970).

12. The State argues that the S.L.P. and its "privies" are barred from maintaining this cause of action by the doctrine of res judicata, citing Socialist Labor Party v. Board of Elections, 69 Civ. 1269 (E.D. N.Y., filed Oct. 16, 1969) and Emanuel v. Power, 25 N.Y.2d 962, 305 N.Y.S. 2d 356 (1969). Again, the Court finds it unnecessary to pass on this issue since these Sections are similarly challenged by the S.W.P. against which such a claim has not been raised.

13. In the first such class, that is, voters who were not registered at the time of the last preceding general election due to inaction, can be placed those who although eligible to participate in the election failed to do so through ignorance of their rights, disaffection with the respective candidates offered, illness or indolence. In the second class, that is, voters who were not registered at the time of the last preceding general election due to ineligibility, can be placed those who have attained their 21st birthday since the preceding election, those who have since been naturalized as United States citizens and those who had not satisfied the residency requirements at that time.

primary, is to publish the list of registered voters before the first day of March, and, in any other year, before the first day of April. Section 377 of the Election Law. These published enrollment lists show the registered voters as of January 1. Since, in the interval between the preceding general election and January 1, registration is not permitted, these lists indicate only those persons eligible to vote in the last preceding general election. Beginning, however, in the second week in January and continuing through August, "central registration" is permitted at which "new" voters may register.[14] These "new" voters may thereafter vote in the primaries of parties which have polled at least 50,000 votes for governor at the last general election and may sign these parties' primary designating petitions. See Sections 135 and 187 of the Election Law.

From this, it can be seen that the State has established procedures whereby persons who become eligible or register to vote after the preceding general election may support candidates of their choice in major party primaries and sign designating petitions for primary election candidates, but may not sign independent nominating petitions. In justification for this apparent invidious discrimination or classification, the State argues that the two situations are not at all analogous since new voters are permitted to support major party candidates only if they first make an ideological declaration of support for such party whereas no such declaration is required of those voters who, in effect, may constitute the constituency of independent political parties. In the Court's opinion, it is frivolous to attempt to justify the disenfranchisement of a substantial number of voters and the denial of associational rights upon this basis.

Further, the State attempts to justify the denial of support for independent parties by those qualified voters who were not registered at the time of the last general election on the grounds of clerical necessity.

This year's voter registration will not be completed until October 10, 1970. Independent nominating petitions must be filed by August 21, 1970, and any objections thereto must be lodged with the Board of Elections within three days thereafter.[15]

In view of the fact that the system of permanent personal registration, now in effect throughout the State of New York pursuant to Section 350 et seq. of the Election Law, could be supplemented by, for example, the circulation of mimeographed lists of newly registered voters which would allow independent nominating petitions to be checked against both these permanent files and the supplements thereto, the Court can find no compelling State interest or a likelihood of "clerical chaos" to justify this grave infringement of First Amendment rights. Procedures whereby qualified voters would be brought into the electoral process at a time subsequent to the last election but prior to the final date for filing independent nominating petitions, which would permit ample time for the verification of such petitions, can easily be envisioned.

Under these circumstances, the provisions of Section 138, which limit signatories of independent nominating petitions to persons who had been registered to vote in the last general election, create arbitrary classifications with respect to new voters who may sign major party primary designating petitions, deny otherwise qualified voters the opportunity to support candidates of their choice and bar minority parties from seeking the support of these new

---

14. Letter from Charles A. LaTorella, Assistant Attorney General, to the statutory three-judge court (dated May 20, 1970).

15. Memorandum of Law for Defendants Rockefeller, Lomenzo and Lefkowitz at 17 (dated May 11, 1970).

voters without compelling justification therefor.

The Court is not unmindful of the decisions in Socialist Labor Party v. Board of Elections, 69 Civ. 1269 (E.D. N.Y., filed Oct. 16, 1969), Emanuel v. Power, 25 N.Y.2d 962, 305 N.Y.S.2d 356 (1969) and Davis v. Board of Elections, 5 N.Y.2d 66, 179 N.Y.S.2d 513, 153 N.E. 2d 879 (1958), but where these cases are indistinguishable from the instant suit we respectfully disagree.

■ On the other hand, that portion of Section 138 which discounts the signature of a voter who has voted at a primary election where a candidate was nominated for an office for which the nominating petition purports to nominate another candidate, can be justified by the compelling State interest to preserve inviolate the sanctity and secrecy of the ballot. Since the State cannot determine which candidate a particular voter selects in the primary or whether he has in fact selected only some of the proffered candidates, this provision can be justified under the present teachings of the Supreme Court.

Additionally, it should be noted that any attack on this provision as being defectively overbroad is without merit since voting in a primary election which involves no contest for and provides no means whereby a preference can be indicated for a candidate for a particular office would not bar that voter from signing an independent party nominating petition on behalf of a candidate for that office. Hooper v. Power, 17 A.D.2d 816, 233 N.Y.S.2d 392, aff'd, 12 N.Y.2d 764, 234 N.Y.S.2d 716, 186 N.E.2d 565 (1962).

■ In turn, plaintiffs attack as defectively overbroad that provision of Section 138(6) which discounts the signature of a voter on a nominating petition if that voter's name appears upon another petition designating or nominating the same or different person for the same office. While plaintiffs'

claims may at first blush appear well taken, they find little support when viewed in light of the interpretation placed by the courts of New York State on this provision.

The purpose of Section 138(6) is to limit each voter to but a single choice for office, Hooper v. Power, *supra*—a permissible State interest in assuring that each independent party is supported by 12,000 *different* qualified voters. The long standing policy of the State has been to liberally construe those provisions of the Election Law which affect nominating petitions for independent parties so as to promote and not hinder voter independence at public elections. In re Independence League, 51 Misc. 486, 100 N.Y.S. 760 (Sup.Ct.1906); see Mc-Donnell v. Cohen, 58 N.Y.S.2d 605, 607 (Sup.Ct.1937); In re McCloskey, 21 Misc. 365, 47 N.Y.S. 294 (Sup.Ct.1897). In this regard, where the same name and address has appeared upon two petitions nominating different candidates for the same office, only one of these signatures was discounted. Application of Tani, 32 Misc.2d 53, 221 N.Y.S.2d 314 (Sup.Ct.1961); In re Commissioner of Elections, 64 Misc. 620, 120 N.Y.S. 580 (Sup.Ct.1909); In re Smith, 41 Misc. 501, 85 N.Y.S. 14 (Sup.Ct.1903); In re Bialis, 92 N.Y.S.2d 450, 453 (County Ct. 1949); *Cf.* Biehler v. Barbuscia, 26 N.Y.S.2d 992 (Sup.Ct.1941). It is therefore likely that the state courts would continue to construe this provision to mean, as this Court does, that the name of a person signing a petition "shall not be counted" on a second *valid* and *effective* petition nominating the same or a different candidate for the same office. As was noted in In re Commissioner of Elections, *supra,* in construing a predecessor section to that in issue, "The signature on one *or* the other of such petitions is unauthorized and must be rejected." (Emphasis added.) As so construed, this provision would be constitutionally permissible. Of course, should this approach not be adopted by the State, then the provision in question

would be "defectively overbroad." For it would be impermissible on less than a showing of a compelling state interest to deny a voter the right to support a candidate of his choice and to deny such support to that candidate when a prior petition signed by that voter is for some reason ruled invalid or when a second candidate for whom a petition has been signed subsequently withdraws from the race or is ruled ineligible for such office.

Plaintiffs' challenge to the "knowledge" requirement of Section 138 (3) presents no difficulty. In view of the New York Court of Appeals holding in Schaller v. McNab, 16 N.Y.2d 976, 265 N.Y.S.2d 290, 212 N.E.2d 776 (1965), defendants' position that "it would be necessary, in the case of an individual not already known to * * * [the witness] to make inquiry as to his identity *and to request identification"* [16] (emphasis added), would appear ill-founded. The Court in *Schaller* reversed the finding of the Appellate Division which held that the subscribing witnesses, who inquired of the signers whether they were residents of the area and duly qualified voters, but who had no knowledge whatever as to the true identity or residence of the signers because they were total strangers, did not "know" the signers as required by Section 135 of the Election Law. This ruling, which would be applicable to Section 138(3), apparently establishes that the witness has acted upon information affording him reasonable knowledge as to the identity of the signers when he simply inquires and is assured that the signers are residents of the area and duly qualified voters.

Under this interpretation, which plaintiffs are of course content to accept, Section 138(3) is constitutionally valid.

Plaintiffs' fourth challenge is presented against the literacy requirements embodied in Section 168 of the Election Law.[17] This statute was last amended in 1965, prior to the decision of the Supreme Court in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Therein, the Court sustained the constitutionality of Section 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), as a permissible exercise of Congressional power under the Fourteenth Amendment. By virtue of the Supremacy Clause, Article IV of the Constitution, the states are now prohibited from conditioning the right to vote upon a showing of literacy in the English language to those persons who have successfully completed the sixth primary grade in any public or private school accredited by any State or territory or by the Commonwealth of Puerto Rico in which the predominant classroom language was other than English. In accord with *Morgan,* the State has assured the Court that the Voting Rights Act of 1965 is directly implemented in New York, so that anyone educated through the sixth grade in an American-flag school is permitted to register to vote in all elections, State and local, general and primary, and is eligible to sign petitions of all kinds, including independent nominating petitions.[18]

Plaintiffs nevertheless seek a ruling that it is constitutionally impermissible to condition the right to vote

---

16. *Id.* at 10–11.

17. Defendants challenge the standing of plaintiffs to attack the State's English literacy prerequisite for voting. Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), however, makes it clear that at least those plaintiffs who have been designated candidates for state-wide office may champion the right to vote of their respective supporters. Indeed, it would appear that political par-

ties are proper groups to present such issues to the courts.

Additionally, although plaintiffs' challenge is levelled against Section 168 of the Election Law, the actual prohibition against those illiterate in the English language is contained in Article II, Section 1 of the New York State Constitution and in Sections 150 and 168 of the Election Law.

18. *Supra* note 14.

upon a showing of literacy in the English language. We decline to do so.

In Lassiter v. Northampton County Election Bd., 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), the Supreme Court directly upheld the constitutionality of a North Carolina requirement that voters be literate in the English language. In so doing, the Court noted the wide scope in which a state can exercise its jurisdiction over voter qualifications, subject only to constitutional limitations. The question of literacy in another language was not, however, raised therein. It must also be noted that in sanctioning this requirement, the Court applied the "rationality" test which was subsequently revised in voting rights suits which present equal protection arguments to a "compelling state interest" test. Kramer v. Union Free School District, *supra*; Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

While the adoption of the compelling state interest test places the continued viability of *Lassiter* in question, in view of the fact that the Court failed to rule the New York literacy test unconstitutional in both *Morgan* and Cardona v. Power, 384 U.S. 672, 86 S.Ct. 1728, 16 L.Ed.2d 848 (1966), and that the Court presently has pending before it an appeal from a decision of a three-judge statutory court which upheld a state English language literacy requirement, Mexican-American Federation-Washington State v. Naff, 299 F.Supp. 587 (E.D.Wash. 1969), prob. juris. noted, sub nom. Jimenez v. Naff, 397 U.S. 1005, 90 S.Ct. 1245, 25 L.Ed.2d 418 (U.S., March 31, 1970), we do not feel justified in hold-ing the New York test unconstitutional until the Supreme Court instructs us that *Lassiter* is no longer the law.[19]

We next consider the contention by plaintiffs in the S.L.P. action that Section 376(5) of the Election Law violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

 Sections 376(5) and 2(4), when taken together, provide that lists of registered voters be delivered free of charge to the county chairmen of each political party polling at least 50,000 votes for governor in the last preceding gubernatorial election. Section 376(5) further requires that at least twelve copies of these lists be available for public inspection at each main or branch office of the board of elections, and that surplus copies be sold to anyone requesting them at a price not to exceed the cost of reproduction.

It is clear that the effect of these provisions, when considered with other sections of the Election Law, is to deny independent or minority parties which have succeeded in gaining a position on the ballot but which have not polled 50,-000 votes for governor in the last preceding gubernatorial election an equal opportunity to win the votes of the electorate. The State has shown no compelling state interest nor even a justifiable purpose for granting what, in effect, is a significant subsidy only to those parties which have least need therefor. See Madole v. Barnes, 20 N.Y.2d 169, 282 N.Y.S.2d 225, 229 N.E.2d 20 (1967).

 In opposition to plaintiffs' contention, the State argues that "[o]ne can readily imagine the heavy burden and

19. We note, however, that distinguished authority argues "that the right to vote is so fundamental that no citizen of this country should be deprived of this right on the ground that he fails to satisfy a literacy requirement. The right to vote is a vital aspect of citizenship which guarantees to every citizen that his interests will be taken into account. Those who cannot pass a literacy test can still participate intelligently in the operations of their government, for media besides the printed word—such as radio, television, oral communication and foreign language newspapers—are available to supply information to potential voters." Committee Report, Extension of the Voting Rights Act of 1965 and the Administrator's Alternative, The Record of the Association of the Bar of the City of New York at 253 (April 1970).

expense that would be placed upon the State if it were required to provide every group, of whatever size, that purported to be a political party, free copies of voting lists.[20] This, however, overlooks one fact and misconstrues another. Firstly, plaintiffs have acknowledged that these lists should not be furnished indiscriminately at government expense to anyone requesting them. What they seek bestowed upon any party which complies with State requirements for placing its candidates before the electorate, is the same benefit granted to major political parties of not having to purchase such lists at considerable expense.[21] Secondly, constitutional strictures merely require that the State treat all groups similarly situated alike. The State is not required to provide such lists free of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them.

Finally, plaintiffs in the second captioned action challenge the constitutionality of that part of Section 31 of the Election Law which, in effect, provides for the appointment of the New York City Board of Elections by the County Chairmen of the New York and Kings County Democratic and Republican parties. It is urged that this provision unconstitutionally deprives minority parties of due process and equal protection of law, insofar as it purports to vest control of the New York City electoral process in the hands of the County Chairmen of the two large political parties. It should be noted that Section 31 also provides that members of the Board of Elections in every other county in the State be appointed in the same manner.

■ Defendants argue that this three-judge court does not have jurisdic-

tion over the attack on Section 31, since plaintiffs specifically challenge only that portion of the statute which applies to New York City, and the attack, therefore, is upon a statute which does not have "statewide application." Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).[22] However, plaintiffs attack the manner in which commissioners of election are appointed. This is the substance of Section 31, and in this respect the statute clearly has statewide application. Accordingly, we hold that Section 31 is a statute of statewide application and that the three-judge court may properly consider the attack upon it made by plaintiffs in the S.L.P. action.

■ However, even if we are incorrect in this holding, sound policy nevertheless requires that the three-judge court decide the Section 31 issue. It is clear, in any event, that a federal district court would have jurisdiction under the Civil Rights Act over this aspect of the complaint. Therefore, the matter is properly cognizable by a federal district court, whether it is heard by one federal judge or three. Moreover, it is well established that even though "a single district judge is without power to act in a case requiring three judges, the opposite is not true." Swift & Co. v. Wickham, 230 F.Supp. 398, 410 (S.D.N.Y.1964), appeal dismissed for want of jurisdiction, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), aff'd, 364 F.2d 241 (2d Cir. 1966), cert. denied, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967); *accord*, Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 129 (S.D.N.Y. 1969). Since we all agree on the proper resolution on the merits of the issue of the validity of Section 31, a decision by

---

20. *Supra* note 15 at 20.

21. Affid. of Bernard Reitzes at 4 (dated April 24, 1970).

22. Defendants go on to argue that pendent jurisdiction in the three-judge court would

also be inappropriate under United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and Hurn v. Oursler, 289 U.S. 238, 246, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). With this branch of their argument we agree.

the three of us on that question, explicitly joined in by the single judge before whom the matter first came, is a wiser course than returning the issue to him. The latter procedure might result in the entry of "an invalid order if the return was erroneous, whereas the only consequence of erroneous retention of jurisdiction by the three-judge court is that the appeal should be taken to the Court of Appeals rather than to the Supreme Court, an uncertainty against which the plaintiffs may protect themselves by timely appeals to both courts." Swift & Co. v. Wickham, *supra*, 230 F. Supp. at 410; *accord*, Law Students Civil Rights Research Council, Inc. v. Wadmond, *supra*, 299 F.Supp. at 129.

■ Turning to the merits, plaintiffs' only argument made in the brief is that allowing the partisan members of the Board of Elections to judge the petitions of minority parties is violative of due process, relying upon Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). However, the tasks delegated to the election commissioners are basically ministerial and subject to judicial review by an impartial court. Moreover, plaintiffs tender no specific examples of abuse.[23]

Accordingly, this three-judge court finds the distributive requirement of Section 138(5)(a) of the Election Law, those portions of Sections 138(1) and (6) which prohibit an otherwise qualified voter from signing an independent nominating petition for public office if such voter was not registered at the time of the last preceding general election as a qualified voter, and that portion of Section 376 which provides that the compilation of current registered voters be sent free of charge only to those parties which polled more than 50,000 votes for governor in the last gubernatorial election constitutionally invalid. Further, we find that portion of Section 138(6) which prohibits an otherwise qualified voter from signing such an independent nominating petition if that voter's name appears upon another petition designating or nominating the same or a different person for the same office constitutionally permissible only when construed to mean that the name of the voter shall not be counted on a second valid and effective petition nominating the same or a different candidate for the same office. Similarly, we find the "knowledge" requirement of Section 138(3) constitutionally valid when interpreted to mean that the authenticating witness has acted upon information affording him reasonable knowledge as to the identity of the signers of petitions for independent nominations for public office when he simply inquires and is assured that the signers are residents of the area and duly qualified voters. However, we find that portion of Section 138(6) which discounts the signature of a voter who has voted at a primary election where a candidate was nominated for an office for which the nominating petition purports to nominate another candidate, the literacy requirements embodied in Section 168, as supplemented by the Voting Rights Act of 1965, and that part of Section 31 which provides for the appointment of the members of the Board of Elections constitutionally valid.

Submit order on notice in accordance herewith.

23. Plaintiffs also included a conclusory allegation in their complaint that they are being denied the equal protection of the law. Since this point was not developed any further, we regard it as abandoned and do not deal with it.