**Fred G. MORITT, Plaintiff,**

v.

**Nelson A. ROCKEFELLER, Governor of the State of New York, et al., Defendants.**

**No. 72 Civ. 1511.**

United States District Court, S. D. New York.

June 12, 1972.

Benjamin Gassman, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen., State of New York, Albany, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Irving Galt, Robert S. Hammer, Asst. Attys. Gen., of counsel.

Burt Neuborne, New York Civil Liberties Union, New York City, for amici curiae Socialist Labor Party, and others.

Before FEINBERG, Circuit Judge, and McLEAN and TENNEY, District Judges.

McLEAN, District Judge:

Plaintiff, Fred G. Moritt, a judge of the Civil Court of New York City, basing jurisdiction on 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983, has moved this three-judge court, convened pursuant to 28 U.S.C. §§ 2281, 2284, for a declaratory judgment, 28 U.S.C. § 2201, that N.Y. Election Law §§ 131, subd. 2 and 136, subd. 5 [1] (McKinney's Consol. Laws c. 17 1971) are unconstitutional and for a permanent injunction restraining defendants, various officials of New York State, from enforcing those sections of the Election Law.

Judge Moritt claims that he has been a candidate for election to the New York

---

1. N.Y. Election Law § 131 (McKinney 1971) provides in pertinent part:

"2. (a) Party nominations of candidates for any other office to be filled by the voters of the entire state shall be made by the state committee or by the enrolled voters of the party.

(b) (1) The state committee shall make a designation by majority vote of the state committee for each such office at a meeting held not earlier than the twelfth Tuesday and not later than the eleventh Tuesday preceding the primary election.

(2) Upon the vote therefor, each member of the state committee shall be entitled to cast a number of votes which shall be in accordance with the ratio which the number of votes cast for the party candidate for governor on the line or column of the party at the last preceding general state election in the unit of representation of such member bears to the total vote cast on such line or column at such election for such candidate in the entire state. The apportionment of such votes as so prescribed shall be determined by the rules of the party.

(3) In addition to such designation the state committee shall also certify each candidate who receives twenty-five per cent or more of the total vote cast in such committee on any ballot and who makes written demand, duly acknowledged, to the secretary of state for entry of his name as a candidate for the nomination to be made at the primary election. Such demand shall be made not later than seven days after such meeting, and may be withdrawn in the same manner within fourteen days after such meeting.

(4) Within two days after such meeting, the minutes of the meeting, duly certified, shall be filed with the secretary of state. In addition, the state committee shall certify to the secretary of state the names of all persons who qualify as candidates for nomination pursuant to subparagraphs two or three of paragraph (b) of subdivision two of this section.

(c) Enrolled members of the party may make other designations by petition for a member of the same party.

(d) If more than one candidate is designated for the nomination of the party for such an office, the nomination of the party shall be made at the primary election at which other candidates for public office are nominated.

(e) No person shall be entitled to designation to more than one state wide office under the provisions of this section."

N.Y. Election Law § 136 (McKinney (1971) provides in pertinent part:

"5. Petitions for any office to be filled by the voters of the entire state must be signed by not less than twenty thousand or five per centum, whichever is less, of the then enrolled voters of the party in the state, of whom not less than one hundred or five per centum, whichever is less, of such enrolled voters shall reside in each of one-half of the congressional districts of the state."

State Court of Appeals since December 1971. At the meeting of the Democratic State Committee, however, Judge Moritt was not selected as a candidate for the Court of Appeals and did not receive 25 per cent or more of the total vote cast in the Committee on any ballot and thus could have his name placed on the ballot in the Democratic primary only by petition. N.Y. Election Law § 131, subd. 2(c) (McKinney 1971).

In his amended complaint, Judge Moritt alleges that Section 136, subd. 5 "renders it difficult if not impossible" for a candidate who was not selected by the State Committee to appear as a candidate at the primary because of the requirement that his petition must be signed by at least twenty thousand or five per centum, whichever is less, of the enrolled voters of the party, of whom not less than one hundred or five per centum, whichever is less, of such enrolled voters shall reside in each of one-half of the congressional districts of the state. He alleges that he was unable to obtain the signatures required by the statute. He asks that this court (1) declare that Section 136, subd. 5 is unconstitutional, (2) adjudicate that a candidate for any statewide office shall be qualified to be such a candidate for nomination in the primary "by filing a petition containing not more than 12,000 signatures of the enrolled voters of his political party, which signatures may be obtained in any Congressional District or Districts in the State of New York," and (3) enjoin defendants from enforcing Section 136, subd. 5.

Upon the argument, Judge Moritt conceded that he had not filed or tendered for filing any petition whatever within the time prescribed by law or at any other time. Defendants contend that under these circumstances no justiciable controversy as to the constitutionality of Section 136, subd. 5 is presented.

██ I think that defendants' position is well taken. Inasmuch as Judge Moritt has not tendered any petition at all, he lacks standing to contend that a petition which complies with his views, al-though not with the statute, should have been accepted if it had been tendered and that he is entitled to be a candidate. Under the present circumstances, this court could not direct that Judge Moritt's name be placed upon the primary ballot. The case, as far as Section 136, subd. 5 is concerned, is not one of "sufficient immediacy and reality" to justify either injunctive relief or a declaratory judgment. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). I therefore decline to pass upon the constitutionality of Section 136, subd. 5.

██ As to Section 131, subd. 2, Judge Moritt does have standing to raise the issue, since his claim does not depend upon whether or not he is himself a candidate. In this part of his complaint, he has challenged the system whereby candidates for the Democratic nomination for the Court of Appeals are designated by the State Democratic Committee. He has asked this court to enjoin enforcement of Section 131 of the Election Law, to declare the proceedings of the Democratic State Committee null and void, and to enjoin defendants from printing on the Democratic primary ballot the names of the candidates for the Court of Appeals who were nominated by the Democratic State Committee pursuant to Section 131 of the Election Law. It is Judge Moritt's position that Section 131, subd. 2 of the Election Law is violative of N.Y.Const. art. 6 because: (a) the statute improperly delegates to the Democratic State Committee the right to nominate candidates for the statewide office of Associate Justice of the New York Court of Appeals, whereas persons not so nominated have the difficult task of having to get on the ballot by petition; and (b) the statute fails to distinguish between candidates who run for statewide office in the executive branch of government and those who run for statewide office in the judicial branch. Whether Section 131 violates the state constitution is more properly a matter for state court resolution and this court should abstain from determining this claim.

■■ Plaintiff also raises the claim that these provisions of Section 131 violate Article 4, §§ 2, 4, the first and ninth amendments, and the equal protection and due process clauses of the fourteenth amendment of the U.S. Constitution. These claims, however, are vague and general at best, and since the Democratic State Committee is made up of two members elected from each assembly district (N.Y. Election Law § 11 (McKinney 1971)), and since there is no claim that any member of the committee, in performing public electoral functions, exercises voting power disproportionate to the number of voters each represents, and since Section 131, subd. 2 does not unreasonably "inhibit entry into the political arena, deny the right to vote or debase the weight of some votes," it does not present this court with a substantial constitutional question. New York State Democratic Party v. Lomenzo, 460 F.2d 250 (2d Cir. 1972). Even if plaintiff did present a valid federal constitutional claim, this court would still abstain from deciding the validity of Section 131, subd. 2 since a decision on the validity of Section 131 under the state constitution by the state court could well avoid the necessity of deciding the federal claim.

Plaintiff's motion is denied. Defendants' motion to dismiss the action is granted on the grounds set forth above.

Settle order on notice.

FEINBERG, Circuit Judge (concurring):

I agree with Judge McLean that since Judge Moritt asks us to declare that a requirement of 12,000 signatures from any district or districts in the state would be valid and yet has not filed a petition containing such signatures, he cannot now as a candidate attack section 136, subd. 5. I do not suggest that a court is necessarily bound by the legal views of the plaintiff before it in adjudicating his right to raise them. But plaintiff's concession—in fact, his assertion—that 12,000 signatures is a reasonable requirement is so obviously correct [1] that plaintiff's failure to meet even this minimum requirement of a petition should end that portion of his case.

Nor do I believe that a contrary result is called for by either Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), or Socialist Workers Party v. Rockefeller, 314 F.Supp. 984 (S.D.N.Y.), aff'd mem., 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970). In Moore v. Ogilvie, the candidates for electors there complaining about the Illinois distributive signature requirement had filed nominating petitions containing the names of the required minimum of 25,000 qualified voters. Thus, plaintiffs there clearly had standing to sue when the suit was brought, and the threshold question before the Supreme Court was one of mootness because the election had already been held by the time the case was argued before it.

In *Socialist Workers*, the plaintiffs were voters and political parties, as well as candidates, who challenged, inter alia, the New York requirement that independent nominating petitions be signed by at least 50 voters in each county of the state. Although it is true that the requirement then in effect that an independent nominating petition contain at least 12,000 signatures was "not contested," 314 F.Supp. at 989, and that none of the candidate-plaintiffs had submitted petitions, the standing problem involved here did not arise, in part, because the suits there were filed well in advance of the time when signatures could be obtained. Here, in contrast, the only plaintiff is a candidate. Moreover, according to plaintiff, the period for obtaining signatures began on April 4, 1972 and ended on May 11, 1972,[2] yet the original complaint was not sworn to until April 12, and the motions for a three-judge court and a preliminary injunction were brought on not by order to show cause but by notice of motion

---

1. Indeed, as Judge Tenney points out, the requirement of 20,000 signatures is similarly clearly reasonable.

2. Plaintiff's Memorandum of Law in Support of Motion, p. 21.

returnable on April 25, by which time over half of the period for collecting signatures had expired. It is my view that when a candidate chooses to wait until well after the period for obtaining signatures has begun to challenge the distributive signature requirement as placing an unconstitutional burden on his candidacy, the court should not adjudicate the constitutional claim unless the plaintiff demonstrates that he has fulfilled the other legitimate state requirement for being a candidate—namely, the minimum signature requirement. Otherwise the court may place itself in the awkward position of having adjudicated a litigant's constitutional claims and yet, as Judge McLean points out, be unable to grant the candidate any relief.

With regard to section 131, I agree with Judge McLean that the federal claims are not substantial. Since the only claims then remaining before us are based upon the state constitution, I would decline to exercise pendent jurisdiction. On that basis, I concur in the result of dismissing the complaint.

TENNEY, District Judge (concurring in part and dissenting in part).

I agree with so much of the majority view that holds plaintiff's challenge to N.Y. Election Law § 131 (McKinney 1971) does not present the Court with a substantial constitutional claim and should be dismissed.

I must respectfully dissent, however, from the decision of my brethren that Judge Moritt has no standing to attack the constitutionality of N.Y. Election Law § 136, subd. 5 (McKinney 1971). If we were faced with a challenge to section 136, subd. 5 *solely* on the ground it creates an unreasonable burden on the candidate and if by way of relief Judge Moritt were seeking to have his name placed on the Democratic primary ballot for June 20, 1972, I would be more inclined to accept the argument that since plaintiff did not tender at least the 12,000 signatures, he concedes the state could constitutionally require, he has no standing to assert his rights as a candidate. *But cf.* Williams v. Rhodes, 393

U.S. 23, 28, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Judge Moritt, however, in his prayer for relief does not seek to have his name placed on the ballot, and his amended complaint at ¶¶ 17, 18 and 19 makes it clear that a second and separate basis for his suit is that section 136, subd. 5 runs afoul of the equal protection clause of the fourteenth amendment because it violates the one-man, one-vote doctrine by diluting the value of the franchise of a large number of voters. Under the circumstances, I do not think we can allow the rights of all the voters to turn on whether Judge Moritt filed the necessary signatures to grant him standing as a candidate to attack the law.

Furthermore, it is clear that a candidate or a political party has standing to assert the rights of the voters. See Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Socialist Workers Party v. Rockefeller, 314 F. Supp. 984 (S.D.N.Y.) aff'd mem. 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970). Although Judge Feinberg attempts to distinguish *Moore* on the ground the candidates in that case had filed nominating petitions containing the required number of signatures, those candidates brought their action long before the election and apparently sought an order placing their names on the ballot. Thus, the filing of the nominating petitions would have been a legitimate prerequisite to granting them the desired relief. The Supreme Court, however, refused to expedite *Moore* and its decision came long after the election, by which time the filing of the petitions had become irrelevant. The Supreme Court, nevertheless, did proceed to the merits of the one-man, one-vote argument since there had been a long history of state enforcement of the challenged law and there was a great likelihood it would continue, despite the fact the candidates could be granted no relief. *Accord* Gray v. Sanders, 372 U.S. 368, 375–376, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). We are faced with a similar state policy, *see Socialist Workers Party,* and the problem will reoccur every time

an insurgent candidate in one of the political parties seeks nomination. Furthermore, for purposes of standing plaintiff can be viewed as a voter vis-a-vis a candidate whose franchise has been seriously diluted by section 136, subd. 5 and who is seeking relief. In any event, I think that Judge Moritt either as a candidate suing on behalf of the voters or as a voter, has standing since he has alleged sufficient "personal stake in the outcome of the controversy [so] as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]" Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *accord*, Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Turning then to the merits, Judge Moritt argues that the distributional or geographical requirements of section 136, subd. 5 violate the one-man, one-vote doctrine, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Baker v. Carr, *supra*, in the same manner as the statutes held unconstitutional in *Moore* and *Socialist Workers Party*. Although the figures for all of the 39 congressional districts in the state are not available to the court, the Board of Elections of New York City has been able to compile accurate figures reflecting the number of registered Democrats, Republicans, Liberals and Conservatives for those 16 districts that lie within New York City, and they are set forth and analyzed in the appendix to footnote 1. These figures demonstrate overwhelmingly that the number of registered party members in at least these 16 districts varies widely, and that accordingly registered voters in some districts have considerably more power than voters in other districts.[1] While it is true that each congressional district has approximately 476,725 *residents*, that figure bears little relation to the number of registered Democrats (or Republicans, Liberals or Conservatives) residing in each district. "Mathematical exactness or precision is hardly a workable constitutional requirement, but deviations from population equality must be justified by legitimate state considerations. Because voting rights require highly sensitive safeguards, this Court has carefully scrutinized state interests offered to justify deviations from population equality." Abate v. Mundt, 403 U.S. 182, 185–186, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971) (citations omitted); *accord*, Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Without passing on the question whether a state can constitutionally require a showing of statewide support rather than a purely numerical showing, it is

1. Section 136, subd. 5 of the election law requires that a candidate obtain the signatures of either 20,000 or 5%, whichever is less, of the voters enrolled in his party in the state. Using the figures supplied by the State, it would appear that this first 5% figure would be applicable only to the Liberal and Conservative Parties since they have less than 400,000 enrolled members in the state. (Democrats: 3,663,201; Republicans: 2,891,716; Liberals: 137,318; Conservatives: 129,017).

There is then a second requirement that provides the candidate must obtain geographical as well as numerical support, *i. e.*, the candidate must obtain the signatures of at least 100 or 5% of the enrolled party members in each of one-half of the congressional districts in the state. Based upon the figures supplied by the Board of Elections, it again appears that the 5% figure applies only to the Liberal and Conservative Parties since they appear to be the only ones with less than 2,000 members in any district. Thus, while a requirement that a candidate obtain a straight percentage of the enrolled party members in each district would not appear to run afoul of the equal protection clause, as far as the Democratic and Republican parties are concerned, an insurgent candidate must obtain 100 signatures in each of one-half of the districts since the 5% figure never comes into play. Inasmuch as there are at least some districts where the 100 signatures requirement is applicable to the Liberal and Conservative Parties as well, the law would not even appear to be valid when limited to the minor parties.
See Appendix to footnote 1.

clear and defendants concede that "a 'distribution' requirement becomes suspect . . . when it gives a voter in one locality greater power than a voter in another part of the States [*sic*]."[2] The justification offered by defendants for section 136, subd. 5 is that the law insures the party's right to reasonable order and stability. Certainly that is not a compelling state interest which will permit it to quantitatively dilute the votes of part of the electorate to the extent done by section 136, subd. 5. *Compare Socialist Workers Party, supra* 314 F.Supp. at 990 *with* Abate v. Mundt, *supra*. Clearly if the requirement in *Socialist Workers Party, supra*, that a party obtain the signatures of 12,000 registered voters of whom at least 50 of each must reside in each of the counties of the state violates the one-man, one-vote doctrine because it invests voters in less populous counties with *equal* veto power over the nomination of a candidate as that power held by the voters in the more populous counties, then a fortiori section 136, subd. 5 is violative of the equal protection clause since it too makes the franchise of certain voters—registered Democrats residing in districts with relatively low Democratic registration—

worth more than that of other voters—those residing in districts with relatively high Democratic registration. *Cf.* Gray v. Sanders, *supra* 372 U.S. at 379–380, 83 S.Ct. 801. Since the signatures of registered Democrats play an integral part in the state scheme of public elections and are in fact the *sine qua non* of an insurgent candidate within the Democratic party who wishes to be placed on the primary ballot, the equal protection clause mandates voter equality and thus requires in effect a one-Democrat, one-vote principle be applied to a process whereby a candidate petitions to be placed on the ballot. *See* Seergy v. Kings Republican County Comm., 308 F. 2d 459 (2d Cir. 1972).[3]

Thus, I think Judge Moritt does have standing to attack the constitutionality of section 136, subd. 5 on the grounds it violates the one-man, one-vote doctrine, and in light of the overwhelming evidence that section 136, subd. 5 does deprive voters throughout the state of an equal voice in the acceptance and rejection of insurgent candidates within the political parties, I think the distributional or geographical requirements of section 136, subd. 5 are unconstitutional. *See Socialist Workers Party*.[4]

2. Defendants' Memorandum of Law at 12 (dated May 19, 1972).

3. These arguments obviously apply to the Republican Party as well, and to the Liberal and Conservative Parties in those districts where they have in excess of 2,000 members.

4. Judge Moritt also contends that the requirement that a candidate obtain the signatures of at least 20,000 voters enrolled in the candidate's party is unconstitutional because it unreasonably abridges the right to vote or associate. To avoid confusion, deception and frustration of the democratic process in an election, a state can require some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot. Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *accord*, Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Similarly the state can require a showing of support for an insurgent candidate within one of

the major parties, provided the standards set by the state are reasonable. *Cf. Socialist Workers Party, supra* 314 F. Supp. at 989. Since Judge Moritt was attempting to have his name placed on the ballot in the Democratic primary, it was reasonable that he be required to show some support among registered Democrats. New York State having 3,663,201 voters enrolled in the Democratic Party, a requirement that a candidate obtain the signatures of only 20,000 voters enrolled in the Party would not appear to be an unreasonable burden, especially in light of the approval by the Supreme Court of a Georgia statute that required minority parties to obtain the signatures of 5% of the registered voters in the state in order to place a candidate on the ballot. Jenness v. Fortson, *supra*. Thus, plaintiff's challenge to the 20,000 signatures as being so great as to impose an unreasonable burden on the rights of the voters and of the candidates seems without merit.

APPENDIX TO FOOTNOTE 1

Congressional Districts Within New York City

| Congres-sional District | Total Reg. Demo. | 5% Total [1] Reg. Demo. | Total Reg. Repub. | 5% Total [1] Reg. Repub. | Total Reg. Lib. | 5% Total [1] Reg. Lib. | Total Reg. Cons. | 5% Total [1] Reg. Cons. | Total Reg. Voters |
|---|---|---|---|---|---|---|---|---|---|
| 7 | 129,826 | 6,491 | 32,886 | 1,644 | 5,620 | 281 | 2,814 | 141 | 187,716 |
| 8 | 144,932 | 7,247 | 37,639 | 1,882 | 5,769 | 288 | 4,075 | 204 | 212,267 |
| 9 | 118,725 | 5,936 | 57,131 | 2,857 | 3,373 | 169 | 7,286 [10] | 364 | 201,267 |
| 10 | 124,537 | 6,227 | 42,253 | 2,113 | 3,983 | 149 | 5,609 | 280 | 190,204 |
| 11 | 133,035 | 6,652 | 27,422 | 1,371 | 5,038 | 252 | 4,001 | 200 | 182,108 |
| 12 | 79,960 | 3,998 | 10,740 | 537 | 3,718 | 186 | 567 | 28 [2] | 103,568 |
| 13 | 169,087 [4] | 8,454 | 28,093 | 1,405 | 6,639 | 332 | 3,004 | 150 | 221,304 |
| 14 | 79,935 | 3,997 | 18,505 | 925 | 3,100 | 155 | 1,637 | 82 [2] | 111,929 |
| 15 | 111,992 | 5,600 | 44,814 | 2,241 | 3,485 | 174 | 4,772 | 239 | 177,304 |
| 16 | 147,710 | 7,386 | 26,979 | 1,349 | 5,930 | 297 | 3,259 | 163 | 197,394 |
| 17 | 68,547 [3] | 3,428 | 32,912 | 1,646 | 1,999 [7] | 100 | 5,589 | 279 | 183,542 |
| 18 | 121,486 | 6,074 | 62,910 [6] | 3,146 | 7,695 [8] | 385 | 2,413 [9] | 121 | 224,935 |
| 19 | 134,763 | 6,738 | 20,074 | 1,004 | 5,713 | 286 | 904 | 45 [2] | 176,474 |
| 20 | 132,400 | 6,620 | 25,532 | 1,277 | 7,008 | 350 | 1,841 | 92 [2] | 206,220 |
| 21 | 75,483 | 3,774 | 8,934 [5] | 447 | 2,932 | 147 | 567 | 28 [2] | 95,303 |
| 22 | 151,718 | 7,586 | 23,997 | 1,200 | 6,946 | 347 | 3,353 | 168 | 203,230 |

1. Rounded off to the nearest whole voter.

2. 5% of the registered party members in the district are less than 100.

3. Lowest Democratic registration among these sample districts. In the 17th Congressional District each 100 registered Democrats = .15% of the registered Democrats in the district.

4. Highest Democratic registration among these sample districts. In the 13th Congressional District each 100 registered Democrats = .06% of the registered Democrats in the district.

5. Lowest Republican registration among these sample districts. In the 21st Congressional District each 100 registered Republicans = 1.12% of the registered Republicans in the district.

6. Highest Republican registration among these sample districts. In the 18th Congressional District each 100 registered Republicans = .16% of the registered Republicans in the district.

7. Lowest Liberal registration among these sample districts.* In the 17th Congressional District each 100 registered Liberals = 5.00% of the registered Liberals in the district.

8. Highest Liberal registration among these sample districts. In the 18th Congressional District 100 registered Liberals = 1.30% of the registered Liberals in the district.

9. Lowest Conservative registration among these sample districts.* In the 18th Congressional District 100 registered Conservatives = 4.14% of the registered Conservatives in the district.

10. Higest Conservative registration among these sample districts. In the 9th Congressional District 100 registered Conservatives = 1.37% of the registered Conservatives in the district.

* Exclusive of those districts in which 5% of the registered party members is less than 100.
On the basis of these figures:

(A) Registered Democrats in the 17th Congressional District have 2.50 times the power of registered Democrats in the 13th Congressional District;

(B) Registered Republicans in the 21st Congressional District have 7.00 times the power of registered Republicans in the 18th Congressional District;

(C) Registered Liberals in the 17th Congressional District have 3.85 times the power of registered Liberals in the 18th Congressional District; and

(D) Registered Conservatives in the 18th Congressional District have 3.02 times the power of registered Conservatives in the 9th Congressional District.