**Ramsay WOOD et al., Plaintiffs,**

**v.**

**Felix PUTTERMAN et al., Defendants.**

**Civ. No. 70–864–W.**

United States District Court,
D. Maryland.

Argued Aug. 4, 1970.

Decided Aug. 31, 1970.
Judgment Affirmed Oct. 19, 1970.
See 91 S.Ct. 104.

Jeffrey M. Shaman, Silver Spring, Md., for plaintiffs.

H. Thomas Sisk, Rockville, Md., for defendants.

Robert F. Sweeney, Deputy Atty. Gen., and Henry R. Lord, Asst. Atty. Gen., Baltimore, Md., for the Atty. Gen. of Maryland.

Before WINTER, Circuit Judge, WATKINS, Chief District Judge and KAUFMAN, District Judge.

WINTER, Circuit Judge:

Plaintiffs allege that they are members of the Nonpartisans for a Better Montgomery County (NBMC), allegedly a political party, and that they have been nominated for county office by that party for the general election to be conducted in Montgomery County, Maryland and elsewhere throughout the state on November 3, 1970. They sue to obtain a declaration that certain provisions of the general election laws of the State of Maryland are unconstitutional because they deny due process and equal protection. They seek to enjoin the enforcement of those provisions. The complaint also prays a preliminary injunction and is accompanied by a motion for that relief. The main objective of the suit is to have plaintiffs' candidacies for county office appear on the ballot at the November, 1970 general election.

Because of the claim of unconstitutionality and the prayer for injunctive relief against enforcement of a state statute, a three-judge court was convened under 28 U.S.C.A. § 2281. While the defendants are all election officials of Montgomery County, Maryland and are not represented by the Attorney General of Maryland, the Attorney General was given notice of the suit and invited to present his views. The Attorney General has participated, and we have been aided by the arguments he presented. Through their own counsel, defendants have filed an "Opposition to Motion for Preliminary Injunction" and a motion to transfer the cause to the Circuit Court for Montgomery County. These pleadings are unknown to federal practice and procedure. When the matter came on for hearing it was apparent that defendants' position was essentially that the complaint fails to state a claim upon which relief may be granted. Accordingly, the pleadings filed by the defendants will be treated as a motion to dismiss under Rule 12, F.R.Civ.P., and the case will be decided on that basis. After argument and before decision, defendants filed an answer. We do not consider it at the present stage of the case.

I.

We take the facts well pleaded as established for purposes of deciding the motion:

NBMC was organized as a political party which confines its activities to the affairs of Montgomery County. Currently there are approximately 166 registered voters of Montgomery County who are members of NBMC. Most of NBMC's members are federal employees who are restricted by the Hatch Act, 5 U.S.C.A. § 7324, from engaging in political management and campaigning beyond the purely local level. 5 U.S.C.A. § 7327.

At the last election of Montgomery County officials, which took place as part of the general election in November, 1966, NBMC nominated candidates for county council. Its nominees were placed on the ballot by the petition procedure as set forth in Ann. Code of Md., Art. 33, §§ 4–1(d) and 7–1. At this election these candidates polled a total of approximately 87,006 votes, or slightly over 11% of the approximately 787,440 votes that were cast for 20 County Council candidates. One of its candidates received 18,870 votes, or slightly over 2.4% of all of the votes cast for County Council.

Although not alleged, it is conceded that NBMC did not participate in the general election held in November, 1968, and no candidates of that alleged political party appeared on the ballot by nominating petition or otherwise. The reason for NBMC's non-participation was the absence of any Montgomery County offices to be filled at that election.

On June 22 and July 1, 1970, NBMC held a dual primary meeting and primary election convention at which it nominated

the plaintiffs for the office of County Executive of Montgomery County, County Surveyor of Montgomery County, and members of the County Council of Montgomery County. Prior to these dates NBMC had requested the defendants, who comprised the Board of Supervisors of Elections for Montgomery County, to rule that NBMC was eligible to nominate candidates either by means of a primary election or primary meeting. Ann. Code of Md. § 4–1. After a long delay defendants advised NBMC that it could not nominate candidates by primary election or primary meeting. A conference between the parties ensued, and this was followed by a letter dated June 18, 1970, from defendants asserting "that there is a void in the election law regarding the establishment of a local political party which could avail itself of either the primary meeting or the primary election method of nomination." The Board's letter further disclaimed authority to fill that void and "to establish the concept of a local political party." When certificates of candidacy for election and certificates of candidacy for nomination in the prescribed form were submitted to the Board on July 6, 1970, the Board refused to accept them. This suit ensued. It should be noted that suit was filed on July 24, 1970, 15 days after the last date (July 9, 1970) that nominations by petition were authorized to be made by Maryland law. Ann. Code of Md., Art. 33 § 4A–3.

## II.

The manner by which candidates may appear on the ballot in Maryland is prescribed by Ann. Code of Md., Art. 33 § 4–1 which, in pertinent part, provides:

### Method of Nomination

§ *4–1. In general.*

(a) Nominations for offices which are filled by elections under the provisions of this article may be made by primary election, primary meeting, or petition.

(b) Nominees of political parties which polled 10% or more of the entire vote cast in the State in the last preceding general election shall be nominated by primary election as hereinafter provided.

(c) Nominees of political parties which polled more than 1% but less than 10% may be nominated by primary meeting as hereinafter provided.

(d) Nominees other than of political parties as provided for in (b) or (c) above may be nominated by petition as hereinafter provided.

\* \* \* \* \* \*

We recently had occasion to discuss this section, as well as other provisions of Maryland's election laws, in Barnhart v. Mandel, 311 F.Supp. 814 (D.Md.1970). There we held that the American Party must be afforded the opportunity to nominate candidates by primary meeting for the November, 1970 general election.

A careful reading of § 4–1 discloses that, except for nomination by petition, nominees of only those political parties which polled certain minimum (and less than certain maximum) percentages of the "entire vote cast in the State" *in the last preceding general election* may be nominated by primary election or by primary meeting, respectively, as plaintiffs seek. If we put aside the question of what constitutes the "entire vote cast in the State" (see our discussion in this regard in *Barnhart*) and assume, without deciding, that NBMC either polled more than 10%, or more than 1% but less than 10%, of the "entire vote cast in the State" at the general election of 1966, NBMC's candidates still cannot appear on the ballot in the November, 1970, general election except by petition. This is so because NBMC did not participate in the *last preceding general election* (November, 1968). Indeed, even the petition route is no longer available to the individual plaintiffs and to NBMC because the time for filing as specified in Art. 33 § 4A–3 has expired. In this connection it should be noted that plaintiffs did not tender their certificates of candidacy for election and their certificates of candidacy for nomination until three days before the last filing date,

even though plaintiffs had notice approximately 18 days before that they would not be received. Notwithstanding that the certificates were immediately refused, plaintiffs waited an additional 18 days before filing suit.

The heart of this case, and the issue which we think determinative, is the validity of the provision of Maryland law which limits access to the primary election or primary meeting route for obtaining a position on the ballot only to political parties which participated in the *last preceding general election*. Stated otherwise, may Maryland in any general election year permit access to the ballot by the primary election or primary meeting route to parties which participated in the last preceding general election and deny it to others which only participated four years before, or earlier? We think the Maryland limitation or classification valid; hence the complaint must be dismissed.

### III.

The principles which control this case are set forth in Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), discussed and applied by us in *Barnhart*, which held that the difference in treatment by the Ohio election laws of the two major parties on the one hand and all other parties on the other hand, making it "virtually impossible" for a third party to obtain a position on the ballot, constituted a denial of equal protection of the laws. Ohio permitted a new party to obtain access to the ballot only by petition signed by qualified voters representing 15% of the number of ballots cast in the last preceding gubernatorial election. But persons qualified to sign the petition were limited to those who had never voted before, and if the requisite number of signatures was obtained, other onerous requirements would come into play. These included the necessity of fielding a slate of candidates for state central committee and the election of delegates to a national convention, the candidates for which must not have voted under other party designation in the

preceding four years. Williams v. Rhodes, 393 U.S. at 25, n. 1, 89 S.Ct. 5. By contrast, Ann. Code of Md., Art. 33 § 7–1 permits nomination by petition signed by only 3% of the total registered voters entitled to vote for the office for which the nomination is sought. There are no other restrictions of any consequence, except that no person may join in nominating more than one nominee for each office to be filled; nor may any person sign more than once for the same nominee for an office. Maryland apparently permits write-ins at general elections, at least when paper ballots are used. Ann. Code of Md., Art. 33 §§ 5–3; 14–1(i) and 17–5.

We need not repeat the extended discussion of *Williams* contained in *Barnhart*. There, Judge Kaufman writing for the court characterized *Williams*: "Williams teaches that a third party must have a reasonable opportunity to place its candidates on the ballot in a general election." 311 F.Supp. at 825. In the context of the contention advanced there—that Maryland must permit the American Party to appear on the ballot in a *primary* election, Judge Kaufman added:

> But nothing in *Williams* would seem to require that every party must be given the opportunity to hold a primary election. Plaintiffs seem to contend that it is a violation of federal constitutional standards for the State of Maryland to afford and require the use of the primary election route by a political party which polled 10% or more of the 'entire vote' in the last general election and at the same time to deny that route to a political party which polled more than 1% but less than 10% of such vote and to make available to the latter only the primary meeting procedures set forth in section 6–1. *Such a classification is unconstitutional only if it is unreasonable.* (emphasis supplied, footnote eliminated). 311 F.Supp. at 825.

The "reasonable" test, properly deduced by Judge Kaufman from *Williams,* is as applicable to the circumstances under

which a political party may avail itself of the primary election or primary meeting avenue to the ballot as to the volume of the vote to qualify it for one of these routes.

■ Application of the equal protection test to election matters is generally governed by the same principles which control application of the equal protection test in other situations. The latest pronouncement of the Supreme Court with reference to the equal protection test, contained in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), is pertinent. In that case it was stated that "if the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" 397 U.S. at 485, 90 S.Ct. at 1161. Borrowing from a statement in an earlier case, the Court added " '[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'" 397 U.S. at 485, 90 S.Ct. at 1161. The Court said further that "[i]t is enough that the State's action be rationally based and free from invidious discrimination." 397 U.S. at 487, 90 S. Ct. at 1162. See also McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed. 2d 393 (1961); Salsburg v. Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954).

## IV.

A variety of state interests, sufficient to satisfy the tests set out in *Dandridge* and our previous analysis of *Williams,* are present in this case. At the outset we note that NBMC is different from the major political parties and from any third party which has heretofore appeared on the Maryland political scene. The difference lies in its restricted scope of interest and activity, both geographically and politically. For purposes of this case, we assume, without deciding, that it is a "political party," within the meaning of Ann. Code of Md., Art. 33 § 1–1(a) (15), although, arguably, other provisions of this article with regard to the organization and function of a "political party" cast doubt upon the correctness of this assumption. For example, §§ 11–2 and 11–3 provide that the governing body of a political party shall be a *state* central committee, composed of members for the several counties and Baltimore City. Depending upon the meaning to be afforded the phrase "entire vote cast in the State" as used in § 4–1 (see *Barnhart,* 311 F.Supp. at 821–824), it is at least theoretically possible that NBMC, or some similar group, may at some time capture 10% of the entire vote cast in a county of the state. In that event, the political party is required to have a constitution and by-laws (§ 11–1(a)) and it may hold party conventions (§ 10–1). But to adpot a constitution and by-laws and to hold a party convention, it must have a *state* central committee.

If NBMC is recognized as a political party and given access to the ballot simply upon a showing of local support at elections in alternate years, there is no reason why its counterparts may not be organized in Baltimore City and other counties throughout the state. More importantly, the possibility, if not the probability, that there will arise competing local political organizations in a single county, or Baltimore City, or even a political subdivision thereof (such as a legislative district, a congressional district, or a councilmanic district) will be greatly enhanced. The presence of a plethora of political parties would necessarily be a source of confusion to the electorate. Numerous political parties would also make increasingly difficult the election of candidates with majority support from the electorate without resort to run-off elections and the attendant expense to the state that they would create. In *Williams* it was said that "the State does have an interest in attempting to see that the election winner be the choice of the majority of its voters", and "the existence of multitudinous fragmentary groups might justify some regulatory control." Williams v. Rhodes, 393 U.S. at 32, 33, 89 S.Ct. at 12. The limitation

of easier access to the ballot to parties which have demonstrated active participation and some measure of success at the last preceding general election does not seem an unreasonable safeguard against these undesirable consequences, especially when the petition procedure by which a new political party may gain access to the ballot is not particularly onerous.

■■■ *Williams* pointed out that "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." 393 U.S. at 32, 89 S.Ct. at 11. As we have pointed out, Maryland's petition procedure to obtain initial access to the ballot, unlike Ohio's, is not unduly onerous and was successfully followed by NBMC in 1966. In an age of federal aid to states, state aid to municipalities and, in Maryland where absolute home rule has not yet been given to political subdivisions, political ideas and governmental policies may not be neatly compartmentalized on a federal, state and municipal level. There is a legitimate state interest, therefore, in encouraging new parties to take part in the entire political process and not to limit their scope of activities solely to one level of governmental organization in order to make them more truly effective. This objective is furthered by limiting the primary election and primary meeting avenues to the general election ballot to political parties which take an active part in all general elections.

■■■ Although we conclude that Maryland's discrimination is "reasonable" and "rational," and not "invidious," because there are reasons to justify it, we recognize that views may differ as to the wisdom of adopting election laws effectuating the state interests that we have discussed. Much may undoubtedly be said in defense of the concept of a "local political party"—a party which

chooses not to participate in every general election. However, Maryland does not preclude the existence of such parties; it only relegates them to a different and more difficult procedure of placing their candidates on the general election ballot. In applying equal protection principles, we are not empowered to decide pure questions of policy. We review *only to the extent of deciding if permissible policy has been pursued.*

### V.

In summary, Maryland's classification between political parties which have participated in the next preceding general election and made a minimal showing of support from the electorate and those which have not, the former being permitted to obtain access to the ballot by primary election or primary meeting and the latter limited to *access to the ballot by petition, is not unreasonable, in violation of the equal protection clause and invalid as denying First Amendment freedoms.*

*The motion to dismiss is granted.* Counsel may submit an order dismissing the complaint with costs.

FRANK A. KAUFMAN, District Judge (dissenting):

Maryland's Constitution provides that county officers shall be elected once every four years for four-year terms. Md.Const. art. XVII Md.Ann.Code vol. 9A (1963 Repl. Vol.). Section 11 of Article XVII provides in part: "The purpose of this Article is to reduce the number of elections, by providing that all State and county elections shall be held only in every fourth year ＊ ＊ ＊." Maryland's election statute, as the majority points out, "limits access to the primary election or primary meeting route for obtaining a position on the ballot only to political parties which participated in the *last preceding general election*" (emphasis in the majority opinion herein). General elections take place every two years in Maryland. Thus, a party which confines itself to countywide efforts can never field a slate of candidates, on a once every four years

basis, except by the primary petition route. The majority's opinion herein concludes that Maryland's petition procedure is not "unduly" or "particularly" "onerous," that "[t]here is a legitimate state interest * * * in encouraging new parties to take part in the entire political process and not to limit their scope of activities solely to one level of governmental organization in order to make them more truly effective," and that a party seeking county-wide office only can be relegated "to a different and more difficult procedure of placing [its] candidates on the general election ballot." To my mind, the difficulty with those conclusions lies in the fact that the petition road prevents the establishment of a well organized political party capable of successfully opposing, on a continuous or long-time basis, a political party with access to the primary election or primary meeting machinery—machinery forbidden to the county-wide party regardless of the success of its candidates at the polls.

The majority fears that "[t]he presence of a plethora of political parties would necessarily be a source of confusion to the electorate," and that "[n]umerous political parties would also make increasingly difficult the election of candidates with majority support from the electorate without resort to run-off elections and the attendant expense to the state that they would create." In Williams v. Rhodes, 393 U.S. 23, 33, 89 S.Ct. 5, 12 (1968), Mr. Justice Black wrote:

> * * * It is true that the existence of multitudinous fragmentary groups might justify some regulatory control but in Ohio at the present time this danger seems to us no more than "theoretically imaginable." No such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case. [Footnote omitted.]

It is true that in Williams, Mr. Justice Black's above-quoted words were written in the context of issues posed by the Ohio law which differ from those presented herein. But those words would seem equally applicable in this case. The permanent and continuing statutory denial to a county-wide party of the opportunity to get on the ballot other than by way of the petition route imposes a very heavy burden on the achievement by a county-wide party of that cohesiveness and permanency of organization and existence which the Maryland law makes possible for a state-wide party in the county involved. That denial also makes it most difficult for any county-wide party to compete with state-wide parties, within the county in question, on anything like an equal basis. Such unequal treatment of a county-wide party as contrasted with a state-wide party establishes the type of unreasonable classification which Williams teaches is forbidden by the equal protection principles inherent in the Fourteenth Amendment. The Supreme Court's application of the one man-one vote principles of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to units of local government, such as county governing bodies (Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968)) and school boards (Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970)), would seem to illustrate the importance of subjecting local and state-wide voting issues to the same standards. And the heavy burden which must be borne to carve out and justify a special classification in a local election contest is illuminated by Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), involving voter qualifications for local school board elections.[1] The possible dangers of fragmentation discussed herein in the majority opinion do not, in my judgment constitute a showing sufficient to shoulder that burden.

The majority opinion cites and discusses Barnhart v. Mandel, 311 F.Supp. 814 (D.Md.1970), in which our decree bends certain statutory language to avoid facial unconstitutionality. In this

---

1. In Kramer (395 U.S. at 626, 89 S.Ct. 1886), the Court cites and refers to Williams.

case, additional bending of a number of the sections of Maryland's election statute is necessary in order to permit NBMC to utilize the primary meeting or the primary election route. The majority refers to many of those sections and the not inconsiderable obstacles they pose. In *Barnhart*, we gave the State, in the context of a different problem, the opportunity to choose between the primary election and the primary meeting routes. In this case, I believe we are either required to follow the same procedure or to hold all or certain portions of the statute invalid.

In *Williams* (393 U.S. at 32, 89 S.Ct. 5), Mr. Justice Black concluded that the State must establish a "compelling interest" before it may be permitted to impose "unequal burdens" on political parties. The majority opinion in this case concludes that there are compelling interests which permit the State of Maryland to impose permanently on a county-wide party the petition route as that party's only method of getting on the ballot, and at the same time to make the primary election route or the primary meeting route available to a state-wide party competing for county offices with the county-wide party. I respectfully dissent because I conclude that such a difference in classification creates an unduly onerous burden which is not justified by any compelling state interest and which therefore constitutes a violation of equal protection principles.