RAZA UNIDA PARTY et al.

v.

Bob BULLOCK, Secretary of State
of Texas.

AMERICAN PARTY OF TEXAS et al.

v.

Bob BULLOCK.

Laurel DUNN et al.

v.

Bob BULLOCK et al.

TEXAS NEW PARTY and Socialist
Workers Party et al.

v.

Preston SMITH, Governor of Texas, and
Bob Bullock.

Nos. SA–72–CA–158, MO–72–CA–50,
W–72–CA–37 and CA–72–H–990.

United States District Court,
W. D. Texas,
San Antonio Division.

Sept. 15, 1972.

Jesse Gamez and Pat Maloney, San Antonio, Tex., for Raza Unida Party, plaintiff.

Gloria T. Svanas, Odessa, Tex., for American Party of Texas, plaintiff.

Laurel N. Dunn, Waco, Tex., for Laurel N. Dunn and others, plaintiffs.

Stuart M. Nelkin and Edward Mallett, Houston, Tex., for Socialist Workers Party and Texas New Party, plaintiffs.

Mario Obledo and Alfred H. Sigman, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., amicus curiae for Raza Unida Party.

Pat Bailey, Asst. Atty. Gen. of Tex., Austin, Tex., for defendants.

Before THORNBERRY, Circuit Judge, and SUTTLE and WOOD, District Judges.

## MEMORANDUM OPINION

SUTTLE, District Judge.

The various plaintiffs, comprised of minor political parties, their candidates for public office, qualified voters wishing to vote for candidates of these political parties, and individuals desiring to run for public office as independent candidates, bring class actions seeking to have this Court declare invalid certain provisions of the Texas Election Code,[1] and related Texas election laws. They also seek to enjoin the Texas Secretary of State from enforcing the challenged enactments. The statutes involved are all statewide in their application, and their constitutionality is questioned on the basis that they violate the First and Fourteenth Amendments to the

---

1. Vernon's Tex.Rev.Civ.Stat.Ann. art. 1.01 et seq. (1967) [hereinafter cited as the Texas Election Code]. The major provision challenged by plaintiffs is Article 13.45(2).

United States Constitution by infringing on the right of association, free speech, equal protection and due process. The plaintiffs seek declaratory and injunctive relief under 28 U.S.C. § 1343 (3), (4); § 2281; and 42 U.S.C. § 1971, § 1981, and § 1983. It is undisputed that the necessary jurisdictional requirements pursuant to 28 U.S.C. § 2281 have been met to require the convening of a three-judge court to determine the issues.[2]

The District Court granted an Order restraining the Secretary of State from refusing to accept any signatures gathered on nominating petitions by the Raza Unida and American Parties between June 30, 1972 and September 1, 1972. The validity of any signatures obtained during this period was conditioned upon the determination on the merits by this three-judge Court. While the individual cases involved herein do not raise identical issues, the general nature of their challenges against the Texas Election laws are similar, and by Order of July 28, 1972, the cases were consolidated for hearing and determination before this three-judge Court.

Texas affords four alternative methods of nominating candidates to the ballot for a general election. First, candidates of parties whose gubernatorial candidate polled more than 200,000 votes in the last general election may be nominated by primary election only.[3] Second, candidates of parties whose candidate polled less than 200,000 votes, but more than 2% of the total vote cast for governor, may be nominated by primary election or by nominating convention.[4] Third, candidates of parties whose candidates polled less than 2% of the total gubernatorial vote in the last general election, and parties who did not have a nominee for governor in the last general election, may be nominated by con-

vention only, or by fulfilling additional requirements set out in article 13.45(2) of the Texas Election Code. Fourth, nonpartisan and independent candidates' names may be printed on the ballot after fulfilling the qualifications set out in article 13.50 of the Texas Election Code.

Plaintiffs Raza Unida Party, the American Party of Texas, the Socialist Workers Party, and the Texas New Party all fall into the third category. Therefore, the thrust of these plaintiffs' attack goes to the constitutionality of article 13.45(2). The other plaintiffs represented by Laurel N. Dunn are independent candidates who challenge the constitutionality of article 13.50. Several of the candidates individually challenge the filing requirements of article 13.47a; the age and residency requirements of article 1.05 and Article IV, §§ 4 & 16 of the Texas Constitution, Vernon's Ann.St.; the loyalty oath required by article 6.02; the prohibition in article 13.09(b) against write-in candidates; the "anti-raiding" statute, article 13.11a; and the uniform primary test required by article 13.11. Finally, the American Party of Texas seeks to have this Court declare unconstitutional the McKool-Stroud Primary Financing Law of 1972.[5]

This is another one of those cases where we as Judges are expected to don the "awesome mantle of omnipotence and unerring clairvoyance" to determine if Texas legislation operates to unconstitutionally burden the rights of voters, political parties, and their candidates.[6] While the Supreme Court of the United States has delineated on the extreme end of the spectrum those combinations of restrictions which unconstitutionally impede the election proc-

---

2. *See* Linda S. v. Richard D., 335 F.Supp. 804, 806 (N.D.Tex.1971).

3. Texas Election Code, art. 13.02 (1967).

4. *Id.*, art. 13.45(1) (Supp.1972).

5. Tex.Laws 1972, 2nd Called Sess., ch. 2, § 1, at 7 [Texas Election Code, art. 13.-08c-1, §§ 1 to 4-A (1972)].

6. *See* Graves v. Barnes, 343 F.Supp. 704, 750 (W.D.Tex.1972) (Wood, J., concurring and dissenting).

ess,[7] and those on the other end which do not,[8] this case presents a new combination which falls squarely in the middle. Because we believe that Courts should exercise restraint in overturning State laws unless clearly unconstitutional, we find that the totality of the Texas Election Code serves a compelling state interest and does not operate to suffocate the election process. Accordingly, we deny all relief requested by plaintiffs.

## I.

■ Defendants move to dismiss the complaints in *Raza Unida Party v. Bullock* and *Socialist Workers Party v. Bullock* wherein they challenge art. 13.45 (2) of the Texas Election Code. Defendants argue that plaintiffs in the two suits lack standing, and that their cases are moot, because, after their suits were filed, the Texas Secretary of State on August 8, 1972 certified that Raza Unida Party and the Socialist Workers Party had complied with the provisions of art. 13.45(2) and should be placed on the ballot for the November general election. The plaintiffs admit that they could receive no further relief from this Court in this election year. Nevertheless, plaintiffs maintain that they are proper parties who continue to present a justiciable "case or controversy" because excessive funds were spent by them this year in order to comply with the burdensome procedures of the Texas Election Code, and they want assurance that they will not have to repeat the process in the next election year.

The issues presented by the Raza Unida Party and Socialist Workers Party suits with regard to art. 13.45(2) are the same as those presented by the other parties to this suit who have not met the requirements. Thus, the issues are preserved for this Court's determination. Nevertheless, the Court finds that these two parties now lack the requisite "personal stake in the outcome" necessary to preserve jurisdiction in this Court.[9] Accordingly, defendant's Motions to Dismiss Raza Unida Party and the Socialist Workers Party are granted. This dismissal is limited to those issues presented with regard to the party obtaining a place on the ballot pursuant to art. 13.45(2), and in no way precludes individual candidates' challenges to other provisions of the Texas Election Code.

## II.

■■ Since *Yick Wo v. Hopkins,*[10] the "political franchise of voting" has been considered a fundamental Constitutional right. The states, of course, are empowered to pass laws regulating the selection of electors by Art. II, § 1 of the United States Constitution. However, any notion that Art. II, § 1 gives the states power to impose burdens on the right to vote, where such burdens are expressly prohibited in other Constitutional provisions, has been rejected by the United States Supreme Court in *Williams v. Rhodes.*[11] In striking down as too burdensome Ohio election laws regulating the placement of minority parties on the ballot, the Court in *Rhodes* discussed the Constitutional provisions protecting voting rights:

> In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification. In the present situation the state laws place burdens on two dif-

---

7. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

8. Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

9. Flast v. Cohen, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed. 947 (1968); Association of Data Processing Serv. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969); *cf.* Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

10. 118 U.S. 356, 65 S.Ct. 1064, 30 L.Ed. 220 (1886).

11. 393 U.S. 23, 29, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

ferent, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States. Similarly we have said [the same] with reference to the right to vote . . . .[12]

■ Although the respondent in this case urges that the traditional "rational basis" test[13] ought to be applied in determining whether the Texas election laws violate equal protection, the Supreme Court consistently has applied the "compelling state interest" test[14] in voting rights cases to determine whether the state's Constitutional power to regulate justifies limiting first amendment freedoms.[15] Primaries as well as general elections have been subjected to this exacting scrutiny.[16]

In *Bullock v. Carter, supra,* the Court for the first time applied the compelling state interest test to restrictions on candidacy.[17] The Court stated that to determine which standard to use when reviewing state regulations barring candidate access to the primary ballot, it is essential to examine the extent and nature of the regulations' impact on the voters. The Court concluded that be-

12. *Id.* at 30–31, 89 S.Ct. at 10 (footnotes omitted).

13. Under this traditional standard the Court must determine "whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970).

14. Under the [compelling interest] standard a state must show both that it has a compelling interest which justifies its laws and that the distinctions drawn by the law are necessary to further its purpose.
The Supreme Court, 1968 Term, 83 Harv.L.Rev. 60, 93 n. 30 (1969).

15. Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Oregon v. Mitchell, 400 U.S. 112, 241, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Brennan, White & Marshall, JJ., concurring and dissenting); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Williams v. Rhodes, *supra. Cf.* Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). *Accord* Yale v. Curvin, 345 F.Supp. 447 (D.R.I., 1972); Manson v. Edwards,

345 F.Supp. 719 (S.D.Mich., 1972); People's Party v. Tucker, 347 F.Supp. 1 (M.D.Pa., 1972); Ferguson v. Williams, 343 F.Supp. 654, 656 (N.D.Miss.1972); Nagler v. Stiles, 343 F.Supp. 415 (D.N.J., 1972); Pontikes v. Kusper, 345 F.Supp. 1104 (N.D.Ill., 1972); Socialist Workers Party v. Welch, 334 F.Supp. 179 (S.D. Tex. 1971); Socialist Workers Party v. Rockefeller, 314 F.Supp. 984, 989 (S.D. N.Y.), *aff'd,* 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970).

16. *E. g.* Bullock v. Carter, *supra;* Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Manson v. Edwards, *supra. Contra* Wood v. Putterman, 316 F.Supp. 646 (D.Md.), *aff'd,* 400 U.S. 859, 91 S.Ct. 104, 27 L.Ed.2d 99 (1970).

17. Respondent's distinguishing argument that the Supreme Court has applied the compelling state interest test only in those cases where an individual's right to vote was absolutely prohibited is in error. The Court in *Rhodes* applied the test under exactly the same circumstances as exist in this case. Likewise Respondent is wrong where he states that *Bullock v. Carter* utilized the rational basis test. In *Bullock,* the Supreme Court for the first time attached fundamental status to candidacy so as to invoke a rigorous standard of review. In fact, *Bullock* was relied upon and cited in *Dunn v. Blumstein* as authority for the compelling state interest test.

cause the Texas Filing Fee Law had an appreciable impact on voters' exercise of the franchise and because this impact was related to the resources of the voters supporting a particular candidate, the state must justify its restrictions under the stricter standard. By this standard the Court must now analyze the impact which the totality [18] of the Texas Election Code has upon the voters.

## III.

In order to have the names of its nominees printed on the general election ballot, a new or minority party must meet the following requirements of article 13.45(2):

1. A list of participants in each precinct convention must be signed and certified by the temporary chairman listing the names, addresses (including street or post-office address), and registration certificate numbers of qualified voters attending such precinct conventions. The names on this list must total at least 1% of the total votes cast for governor at the last preceding general election. This year, the total needed was approximately 22,000 signatures.

2. If the number of qualified voters attending the precinct conventions is less than the required 1%, there must be filed, along with the precinct lists, a petition requesting that the names of the party's nominees be printed on the gen-

eral election ballot, signed by a sufficient number of additional qualified voters to make a combined total of at least 1% of the total votes cast for governor in the last preceding general election. The address and registration certificate number of each signer must be shown on the petition.

3. No person who, during the voting year, voted at any primary election or participated in any convention of any other party may attend the minority party convention or sign the petition or the signature will be void and that person subject to criminal penalties.

4. The petition may not be circulated for signatures until after the date set for the holding of the major parties' primaries.[19] Signatures must be certified to the Secretary of State's office before 20 days after the date for holding the party's state convention.[20] This year minority parties had from May 6th until June 30th, or approximately 53 days, to gather signatures.

5. Each person who signs a petition must be administered an oath [21] before a notary public at the time he signs.

Plaintiffs contend that these requirements, singly and in totality, impede the election process, the right of association guaranteed by the First Amendment, and are violative of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

---

18. In Williams v. Rhodes, *supra*, the majority (393 U.S. at 34, 89 S.Ct. 5, 21 L. Ed.2d 24), concurring (393 U.S. at 39, 89 S.Ct. 5, 21 L.Ed.2d 24) (Douglas, J.), and dissenting (393 U.S. at 62, 89 S.Ct. 5, 21 L.Ed.2d 24) (White, J.) opinions each pointed to the "totality" of the law to find it unconstitutional. *Accord* Socialist Labor Party v. Rhodes, 318 F.Supp. 1262, 1268 (S.D.Ohio 1970), *appeal dism'd*, Gilligan v. Sweetenham, 405 U.S. 949, 92 S.Ct. 1161, 31 L.Ed.2d 227 (1972); Socialist Workers Party v. Rockefeller, 314 F.Supp. 984, 989 (S.D. N.Y.), *aff'd*, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970).

19. Primaries must be held on the first Saturday in May. Texas Election Code, art. 13.47 (Supp.1972).

20. State conventions must be held on the second Saturday in June. *Id.*

21. To each person who signs the petition there shall be administered the following oath, which shall be reduced to writing and attached to the petition: "I know the contents of the foregoing petition, requesting that the names of the nominees of the ————— Party be printed on the ballot for the next general election. I am a qualified voter at the next general election under the constitution and laws in force, and during the current voting year I have not voted in any primary election or participated in any convention held by any other political party." Art. 13.45(2).

The State of Texas argues that it has a compelling interest in requiring some minimum amount of public support before placing a candidate's name on the ballot and in assuring that all candidates are in fact seeking elective office in good faith. The Court agrees that these are valid state objectives.[22] A review of the decisions since *Williams v. Rhodes, supra,* leads this Court to conclude that the totality of the scheme required by article 13.45(2) is not constitutionally impermissible. The Supreme Court in *Jenness v. Fortson, supra,* balanced Georgia's "relatively high" 5% petition requirement against the absence of oppressive party organization requirements, voter cross-over prohibitions, or a restrictive petition circulating time period. Likewise, Texas' lenient 1% petition requirement must be balanced against its more burdensome party organization, circulation, and anti-raiding requirements.

Certainly the minimal 1% required by Texas to show voter support as a condition for ballot position serves a legitimate state objective. Percentage requirements of 15%, 7%, and 2% have been struck down by some Courts.[23] But other Courts have upheld percentage requirements ranging from 1% to 5%.[24] Even in Williams v. Rhodes,[25] the Court noted the lenient 1% requirements of a vast majority of the states. Although any percentage requirement is necessarily going to be arbitrary, 1% is a fair minimum to serve the state's compelling interest in this regard.

The Court in *Jenness,* 403 U.S. at 441, 91 S.Ct. 1970, 1975–1976, 29 L.Ed. 2d 554, pointed out that "a large reason" for the invalidation of the Ohio election scheme in *Williams* was Ohio's requirement that small parties establish "elaborate statewide, county-by-county, organizational paraphernalia." The Texas requirement of precinct, county, and state conventions is obviously more burdensome than the Georgia scheme upheld in *Jenness,* but is clearly more hospitable to new or small parties than was the "entangling web of election laws" invalidated in *Williams.* Following the *Jenness* command to look to the "totality" of a state's requirements, and balancing Texas' burdensome organization requirements against its lenient 1% petition requirement, we hold that the organization requirements are constitutionally permissible.

Plaintiffs challenge the provisions of article 13.45(2) which prevent the circulation of minority party nominating petitions until the day following the majority parties' primary elections, and then prohibit anyone who has voted in a primary from signing a minority party petition. The State argues that the requirement that a new party hold a precinct convention on primary day affords that party an equal opportunity with all other parties to attract the voter to its political process. Thus, if the party has at least 1% support, and the people attend the convention, there is no need for the petition requirement at all. Additionally, if the petitions are

---

22. Bullock v. Carter, 405 U.S. at 145, 92 S.Ct. 849, 31 L.Ed.2d 92; Jenness v. Fortson, 403 U.S. at 442, 91 S.Ct. 1970, 29 L.Ed.2d 554; Williams v. Rhodes, 393 U.S. at 32, 89 S.Ct. 5, 21 L.Ed.2d 24.

23. Williams v. Rhodes, *supra* (15%); Peoples Party v. Tucker, 1 F.Supp. 347 (M.D.Pa., 1972) (2%); Socialist Workers Party v. Rhodes, 318 F.Supp. 1262 (S.D.Ohio 1970), *appeal dism'd,* Gilligan v. Sweetenham, 405 U.S. 949, 92 S.Ct. 1161, 31 L.Ed.2d 227 (1972) (7%).

24. Jenness v. Fortson, *supra* (5%); Jones v. Hare, 440 F.2d 685 (6th Cir.), *cert.*

*denied.* Jones v. Austin, 404 U.S. 911, 92 S.Ct. 237, 30 L.Ed.2d 184 (1971) (1%); Jackson v. Ogilvie, 325 F.Supp. 864 (N.D.Ill.), *aff'd,* Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (5%); Moore v. Board of Elections, 319 F.Supp. 437 (D. D.C.1970) (2%); Wood v. Putterman, 316 F.Supp. 646 (D.Md.), *aff'd,* 400 U.S. 859, 91 S.Ct. 104, 27 L.Ed.2d 99 (1970) (3%); People's Constitutional Party v. Evans, 83 N.M. 303, 491 P.2d 520 (1971) (3%).

25. 393 U.S. at 33 n. 9, 89 S.Ct. 5.

circulated well in advance of the precinct conventions and primary elections, a voter may sign before another party's position has crystallized and the voter would be precluded from changing his mind. Third, the State argues that by delaying the petition circulating process until after the primary election, there is less chance that individual voters will become confused or engage in the party process of more than one party.

 We agree with the State's contentions. The Courts recognize a state's compelling interest to preserve the integrity of its election process.[26] Under the Texas scheme a voter may exercise the franchise by voting in the primaries or by attending a minority party convention. "He cannot have it both ways. Such a requirement seems not only fair but mandatory under the holding in Baker v. Carr, [369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)]."[27] Several Courts have found that a state has an interest in preventing "raiding," whereby members of one party vote in the primary of another party for the sole purpose of bringing about the nomination of the weakest candidate. So long as these "anti-raiding" provisions are narrowly drawn, as is the challenged Texas provision, the right of disaffected voters to associate in a new political party is not unduly burdened.[28]

 Likewise, the provision of article 13.45(2) which requires the administering of a prescribed oath before a notary to those signing the petitions serves a compelling interest to insure that participants in one party's nominating process do not participate in another's. When questioned by the Court in oral argument, counsel for Raza Unida Party admitted that the oath and notary requirements did not hinder their efforts to secure signatures. There is apparently no workable alternative to the requirement that each person who signs a petition be administered an oath if the state is to be able to enforce its criminal penalties against cross-over voting and apprize the voters of these possible penalties. Given the state's interest in insuring that different candidates for the same office are supported by different voters, we uphold the oath requirement for want of a feasible alternative.

The State advances two arguments in support of its requirement that a new party circulate and obtain within a 55-day period (120 days before the general election) the required signatures to be filed with the Secretary of State. First, a failure to obtain the required 1% at precinct conventions, and in the 55 days thereafter by petition, indicates that the political party involved lacks political support or initiative. The Court agrees

26. *E. g.* Rosario v. Rockefeller, 458 F.2d 649, 652 (2nd Cir. 1972), *cert. granted,* 406 U.S. 957, 92 S.Ct. 2062, 32 L.Ed.2d 343 (1972); Briscoe v. Kusper, 435 F.2d 1046, 1054 (7th Cir. 1970); Lester v. Board of Elections, 319 F.Supp. 505, 509 (D.D.C.1970); Socialist Workers Party v. Rockefeller, *supra*, 314 F.Supp. at 993.

27. Jackson v. Ogilvie, 325 F.Supp. at 867.

28. *Compare* Texas Election Code, art. 13.45(2) [voter cannot participate in majority party primary and minority party election process in the same election year] *with* Rosario v. Rockefeller, *supra* [held constitutional a statute requiring voter to be enrolled as a party member prior to the previous general election before he can vote in the primary]; Lippitt v. Cipollone, 404 U.S. 1032, 92 S.Ct.

729, 30 L.Ed.2d 725 (1972), *aff'g,* 337 F.Supp. 1405 (N.D.Ohio 1971) [held constitutional a statute prohibiting candidacy in party primary if person voted as a member of a different political party in the past preceding four years]; Yale v. Curvin, 345 F.Supp. 447, (D.R.I., 1972) [held unconstitutional statute prohibiting vote in primary of any political party if voted in primary of another political party in preceding 26 months]; Pontikes v. Kusper, 345 F.Supp. 1104, (N.D. Ill., 1972) [held unconstitutional statute prohibiting vote in primary if voted in primary of another party within preceding 23 months]; Nagler v. Stiles, 343 F. Supp. 415 (D.N.J.1972) [held unconstitutional statute requiring that two successive primaries must elapse before voter may switch parties].

that the requirements must not be unduly burdensome due to the fact that two minor political parties obtained a place on the ballot by fully complying with every provision of the Texas Election Code. Second, the State argues that a cut-off period of 120 days is necessary in order for the Secretary of State to check the validity of the signatures on the petitions as best he can in sufficient time to allow, not only the printing of the ballot, but any legal contests which might arise.[29]

Of course, "administrative convenience . . . alone may not be invoked to impinge upon the exercise of important constitutional rights."[30] While the State has shown a valid interest which must be recognized, the plaintiffs have made no showing that these requirements have actually denied to them rights secured by the United States Constitution.[31] We can find nothing in this system which abridges the rights of free speech and association secured by the First and Fourteenth Amendments.

Nor does the Court find a violation of Equal Protection. The states have broad discretion in formulating election policies. Williams v. Rhodes, 393 U.S. at 34, 89 S.Ct. 5, 21 L.Ed.2d 24. The Supreme Court in Jenness v. Fortson, 403 U.S. at 441, 91 S.Ct. 1970, 29 L.Ed.2d 554, recognized that holding primary elections involved burdens equal to those encountered in circulating nominating petitions. But, as demonstrated by the successful attempt of the Raza Unida and Socialist Workers Parties, the provisions of article 13.45(2) do not operate to "freeze the political status quo." Jenness v. Fortson, *supra*. As the Court aptly stated in *Tansley v. Grasso*:

> It may well be that the plaintiffs have strong feelings that this legislative distinction creates an unnecessary burden upon prospective candidates for public office, however, if their claim has any merit their proper forum is before the state legislature. The plaintiffs have shown no invidious discrimination.[32]

Accordingly, plaintiffs' challenges to the constitutionality of article 13.45(2) are found to be without merit and are denied.[33]

## IV.

Plaintiffs, American Party of Texas and Texas New Party, challenge the constitutionality of article 13.47a, which requires that a person comply with the provisions of article 13.12 in filing his intention to become a candidate. Article 13.12 provides that the application may not be filed later than 6 p. m. on the first Monday in February (or February 7, 1972 this year), three months preceding the primary or convention. Because the American Party does not allege that any of its candidates were

---

29. In this connection, article 1.03(2) of the Texas Election Code requires the Secretary of State to certify the candidates nominated for office to the county clerks at least 30 days prior to the general election. The State argues that it actually needs longer than 30 days in order to let the bids on the printing of ballots, etc.

30. Ferguson v. Williams, 343 F.Supp. 654, 656 (N.D.Miss.1972).

31. *Compare* Jackson v. Ogilvie, 325 F. Supp. at 869 [64 days]; Moore v. Board of Elections, 319 F.Supp. 437, 438 (D. D.C.1970) [54 days].

32. 315 F.Supp. 513, 519 (D.Conn.1970).

33. The Texas New Party also challenges the provisions of article 13.45(2), which require the signers of nominating petitions to be currently registered voters. The contention was mentioned only once in the New Party Complaint (Pt. 6c), and was not briefed by either side. Clearly the requirement that all voters be currently registered voters is not constitutionally infirm. If plaintiffs are attempting to challenge the durational residency requirements of the statute, they have done so improperly. No allegations were offered that any of the plaintiffs were denied the right to vote because of the registration requirements. In fact, plaintiffs stipulated that Elizabeth Cox and James Damon, voters joining in the New Party suit, are both *qualified* voters. Thus, this issue is not properly before the Court and need not be decided.

denied the ballot because of failure to comply with this provision, it lacks standing to contest this issue. However, plaintiff David Hale, who filed as a New Party candidate for the office of Sheriff of Nacogdoches County, Texas after February 7, 1972, preserves this issue for our determination.

■ The State requires all persons, including those who seek election in party primaries, to file on the same date. Therefore, plaintiff's contentions that the provision is violative of equal protection and due process are without merit. Similar contentions were recently rejected in *Socialist Workers Party v. Rhodes*:

> The state has an interest in having persons who otherwise qualify for ballot position officially become candidates at a designated time prior to an election. In addition, the state may reasonably require that all persons seeking elective office become officially declared candidates on or before a certain date preceding an election. One may not play dog in a political manger by withholding his determination of candidacy until after party candidates are chosen by the primary process.[34]

Accordingly, plaintiff Hale's prayer to enjoin the defendant from refusing to place his name on the ballot due to his failure to comply with articles 13.47a and 13.12 is denied.

## V.

■ Plaintiff Debby Leonard, Socialist Workers Party candidate for Governor of Texas, and plaintiff Meyer Alewitz, Socialist Workers Party candidate for Lt. Governor of Texas, challenge the constitutionality of the age and residency requirements for those offices imposed by Article IV, §§ 4 & 16 of the Texas Constitution. Because neither of these plaintiffs have alleged that they were denied access to the ballot for failure to meet the residency requirement, they have no standing to challenge this provision, and we cannot entertain the issue. They do, however, present a justiciable question regarding the age requirement.

■ Article IV, §§ 4 & 16 of the Texas Constitution provides that the Governor and Lt. Governor of the State of Texas "shall be at least thirty years of age . . . ." Plaintiff Meyer Alewitz is presently 21 years of age. Plaintiff Debby Leonard was 29 years old when she filed, but will be 30 on September 11, 1972 before the general election. Otherwise, each are qualified to hold these elective offices. The parties have not informed the Court whether the Secretary of State interprets the provision as requiring a candidate for these offices to be 30 years of age at the time of filing; the statute is also silent on the matter. For purposes of this discussion, the Court will assume that plaintiff Leonard is not presently qualified as a candidate for Governor.

Plaintiffs claim that it is constitutionally impermissible to deny a citizen who is over 18 years of age elective office simply because he has not reached the age of 30 years. Plaintiffs contend that such invidious discrimination against otherwise qualified citizens cannot be justified by any compelling state interest and thus denies those persons between the ages of 18 and 30 the equal protection of the laws, as well as First Amendment freedoms of association, petition, and speech.

The only case in point which we have been able to find supports plaintiffs' position. In *Manson v. Edwards*,[35] a Michigan city charter provision requiring all candidates for the Detroit City Council to be at least 25 years of age was tested by the compelling interest standard and held violative of Equal

---

34. 318 F.Supp. 1262, 1273 (S.D.Ohio 1970), *appeal dism'd as moot sub nom.* Gilligan v. Sweetenham, 405 U.S. 949, 92 S.Ct. 1161, 31 L.Ed.2d 227 (1972).

35. 345 F.Supp. 719 (E.D.Mich., 1972).

Protection. The Court reasoned that the rejection of candidates less than 25 years old also denied some citizens the opportunity to vote for the candidate of their choice in violation of First Amendment freedoms. The City made no showing that the knowledge or wisdom arguably necessary to fulfill the duties of Councilman are absent in all or most persons between the ages of 18 and 24.

We respectfully decline to follow the *Manson* decision. We find that the state has an interest, whether compelling or otherwise,[36] in having a minimum maturity in voters and in having an informed electorate. The Supreme Court recognized prior to the adoption of the 26th Amendment to the United States Constitution that a state could constitutionally establish a minimum age for its voters.[37] There is no question that Congress could do so in national elections as well.[38] As the Court recently observed in *Bullock v. Carter, supra,* "the rights of voters and the rights of candidates do not lend themselves to neat separation . . . ."[39] Therefore, this Court will not extend the Equal Protection Clause to nullify the states' powers over election requirements for candidates where they once had the Constitutional power to prescribe such regulations for voters. The Framers of the United States Constitution saw the wisdom in establishing minimum age requirements for President, Vice-President, and Members of Congress.[40] Until the Supreme Court holds otherwise, this Court has reached the "formidable 'Stop' sign" referred to by Mr. Justice Harlan in Oregon v. Mitchell, 400 U.S. at 152, 91 S.Ct. 260, 27 L.Ed.2d 272, through which we will not run. Accordingly, the injunctive relief sought by plaintiffs Leonard and Alewitz to enjoin defendant from refusing to place their names on the general election ballot for failure to comply with the age requirement of Article IV, §§ 4 & 16 of the Texas Constitution is denied.

## VI.

Several of the plaintiffs allege that the Texas Election Code is invidiously discriminatory because it does not provide absentee balloting for minority and independent candidates while it does allow absentee ballots to be cast for candidates of majority parties. We find plaintiffs' contentions to be without merit.

The Supreme Court in *McDonald v. Board of Election Comm'rs*[41] held that the traditional rational basis standard rather than the more exacting compelling interest test should be used in evaluating classifications involving absentee ballot provisions. Although the State of Texas does not offer any reasons for the lack of a provision allowing voters to cast absentee ballots for minority party candidates and independents, "Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only

---

36. See the discussion on the propriety of using the compelling interest standard in reviewing a state's right to establish minimum age requirements in Oregon v. Mitchell, 400 U.S. 112, 294, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Stewart, J., concurring and dissenting); Gaunt v. Brown, 341 F.Supp. 1187, 1190–1192 (S.D.Ohio 1972).

37. *See, e. g.,* Oregon v. Mitchell, *supra;* Kramer v. Union Free School District, 395 U.S. 621, 625, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Lassiter v. Northampton County Election Bd., 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959); *cf.* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1964); Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904).

38. Oregon v. Mitchell, *supra.*

39. 405 U.S. at 143, 92 S.Ct. at 856.

40. U.S.Const. art. I, § 2 [Representatives], § 3 [Senators]; Art. II, § 1 [President]; Amend. 12 [Vice-President].

41. 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

if no grounds can be conceived to justify them." [42]

Conceivably, Texas has a rational basis in refusing to expend the time, money, and effort required to print and distribute absentee ballots at state expense for minority parties.[43] The different treatment accorded minority and majority parties in Texas is not arbitrary and invidious discrimination totally unrelated to the object of the legislation.[44] In *McDonald* the Court treated absentee ballot legislation as remedial legislation designed to extend the franchise to those who had previously been unable to exercise it. But the Court stated that such legislation should not be invalidated merely because the legislature failed to cover all classes of persons who might benefit from it.[45]

### VII.

Plaintiff Laurel N. Dunn, independent candidate for the United States House of Representatives, represents himself and several other independent candidates in their challenge of article 13.50 of the Texas Election Code, which sets out the requirements independent candidates must meet in order to get on the general election ballot.[46] The other plaintiffs represented by Dunn are two independent candidates for the Texas House of Representatives, one independent candidate for the Texas Senate, and one independent candidate for county commissioner of McClennan County, Texas.

 Other than a general allegation that the requirements of article 13.50 are "unduly burdensome" as to them, plaintiffs present absolutely no factual basis in support of their claims. We reject outright plaintiffs' argument that states can impose no additional election requirements other than those found in the United States Constitution.[47] Plaintiffs admitted in oral argument that they did not attempt in any way to comply with the provisions of article 13.50. Since *inability*, rather than *unwillingness*, to comply is crucial here,[48] there is some basis for holding that these plaintiffs lack standing to challenge the requirements of the Texas Election Code. Nevertheless, we conclude for the same reasons stated in Part III of this opinion that the requirements of article 13.50 serve a compelling state interest and do not operate to suffocate the election process. Nor are they violative of Equal Protection. The totality of the scheme imposed upon independent candidates is even less burdensome than that required of political parties. For these reasons we hold article 13.50 constitutional and deny relief to plaintiffs.

### VIII.

 The American Party of Texas challenges the constitutionality of the McKool-Stroud Primary Financing Law

42. *Id.* at 809, 89 S.Ct. at 1408, 22 L.Ed. 2d 739.

43. *See* Fidell v. Board of Elections, 343 F.Supp. 913, 915 (E.D.N.Y.1972).

44. *See* Morey v. Doud, 354 U.S. 457, 465, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); Smith v. Cahoon, 283 U.S. 553, 567, 51 S.Ct. 582, 75 L.Ed. 1264 (1931).

45. McDonald v. Board of Election Comm'rs, 394 U.S. at 809, 811, 89 S.Ct. 1404, 22 L.Ed.2d 739.

46. Article 13.50 constitutes the major focal point of attack by these plaintiffs. However, they also challenge article 13.09 (b), prohibiting write-in balloting in Texas; article 13.11a, prohibiting any person who has participated in a party primary or convention from being placed on the ballot as an independent candidate; and article 13.11, requiring a uniform primary test.

Because the plaintiffs have failed to allege or show that they were denied access to the ballot through the operation of any of these statutes, the issues presented are not properly before this Court and are not decided.

47. *See* Bullock v. Carter, 405 U.S. at 145, 92 S.Ct. 849, 31 L.Ed.2d 92; Jenness v. Fortson, 403 U.S. at 442, 91 S.Ct. 1970, 29 L.Ed.2d 554; Williams v. Rhodes, 393 U.S. at 32, 89 S.Ct. 5, 21 L.Ed.2d 24.

48. Bullock v. Carter, 405 U.S. at 146, 92 S.Ct. 849, 31 L.Ed.2d 92.

of 1972.[49] The pleadings allege, not only violations of the Due Process and Equal Protection Clauses of the United States Constitution, but a myriad of State constitutional violations as well. We decline pendent jurisdiction of the State constitutional issues.[50] Furthermore, we find plaintiffs' allegations bottomed upon the Constitution of the United States to be without merit.

■ The McKool-Stroud Act was passed to provide financing for party primaries after the Supreme Court held the Texas filing fee requirements unconstitutional in *Bullock v. Carter*,[51] The Act provides that the State of Texas will finance the primary elections of only those political parties casting 200,-000 or more votes for governor in the last preceding general election. Thus on its face, the Act excludes any payment of state funds to minority political parties.

The State supports the validity of the Act by arguing that only those major parties required to hold primary elections by article 13.02 of the Texas Election Code incur the large expense entailed in conducting a party primary election. The convention and petition procedure available for small or new parties carries with it none of the expensive election requirements burdening those parties required to conduct primaries. There exists no need for expenditures of state funds for political groups which may have little if any voter support. If, however, minority parties reach a size where they are forced to conduct party primary elections, they will, in turn, be the recipients of the State's financial assistance. Such an arrangement is constitutionally permissible.[52]

49. Tex.Laws 1972, 2nd Called Sess., ch. 2, § 1. at 7 [Texas Election Code, art. 13.08c-1, §§ 1 to 4-a (1972)].

50. *See* United Mine Workers v. Gibbs. 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ["It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."] Although the American Party claims to have applied for mandamus against enforcement of the McKool-Stroud law in the Texas Supreme Court on May 3, 1972 which was summarily refused thus "exhausting" state remedies. this Court should not and does not have to concern itself with the interpretation of the Texas Constitution—a task through comity better left to state courts.

51. 405 U.S. 134, 92 S.Ct. 849. 31 L.Ed. 2d 92 (1972), *aff'g*, Carter v. Dies, 321 F.Supp. 1358 (N.D.Tex.1970).

52. [A]ny political body that wins as much as 20% support at an election becomes a "political party" with its attendant ballot position rights *and primary election obligations*, and any "political party" whose support at the polls falls below that figure reverts to the status of a "political body" with its attendant nominating petition responsibilities and *freedom from primary election duties*. We can find in this system nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments.

* * * * *

The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

. . . [W]e can hardly suppose that a small or a new political organization could seriously urge that its interests would be advanced if it were forced by the State to establish all of the elaborate statewide, county-by-county, organizational paraphernalia required of a "political party" as a condition for conducting a primary election.

. . . [T]here are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of in-

Finally, the State of Texas specifically raised the possibility of just the type of attack here presented before the Supreme Court in *Bullock v. Carter*. In answering the State's contention, the Court stated:

> [T]he Court has recently upheld the validity of a state law distinguishing between political parties on the basis of success in prior elections. *Jenness v. Fortson, supra.* We are not persuaded that Texas would be faced with an impossible task in distinguishing between political parties for the purpose of financing primaries.[53]

The only conclusion that can be drawn from the Court's statement is that they anticipated that only those political parties required to engage in the expensive primary elections would receive State financial aid. This Court will not invalidate the Texas Legislature's reasonable attempt to comply with that directive.

In sum, this Court finds that the Texas Election Code is not comprised of "an entangling web of election laws" of the type referred to by Mr. Justice Douglas and invalidated in Williams v. Rhodes, 393 U.S. at 35, 89 S.Ct. at 13. Obviously, it does not operate to "freeze the status quo" since two minority parties have qualified and been certified to the ballot in Texas. *Compare* Jenness v. Fortson, 403 U.S. at 431, 91 S.Ct. 1970, 29 L.Ed.2d 554. After close scrutiny, this Court cannot say that, in serving its compelling interests, Texas has chosen the way of greater interference in establishing alternative routes to the ballot. Dunn v. Blumstein, 405 U.S. at 343, 92 S.Ct. 995, 31 L.Ed.2d 274.

It is, therefore, ordered, adjudged and decreed:

1. That articles 1.05, 13.11a, 13.45 (2), 13.47a, and 13.50 of the Texas Election Code; the minimum age requirement of Article IV, §§ 4 & 16 of the Texas Constitution; and the McKool-Stroud Primary Financing Law of 1972 are not violative of the First and Fourteenth Amendments to the United States Constitution. Therefore all relief requested by plaintiffs is denied and the complaints are dismissed.

2. That the temporary restraining order heretofore entered extending the time to gather signatures on nominating petitions from June 30, 1972 to September 1, 1972 is hereby dissolved. All signatures obtained during this period are null and void.

3. That all motions not heretofore acted upon by this Court are hereby denied.

An appropriate order will enter accordingly.

---

vidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in Williams v. Rhodes, *supra.*

403 U.S. at 439–442, 91 S.Ct. at 1975, 1976 (emphasis supplied) (footnotes omitted).

53. 405 U.S. at 147, 92 S.Ct. at 858.